Alice Lee CRESPO, Plaintiff,

v.

**SCHERING PLOUGH DEL CARIBE, INC., Defendant.**

No. CIV. 01–2014(HL).

United States District Court, D. Puerto Rico.

Oct. 31, 2002.

Jose A. Gallart, Michelle Pirallo–Di Cristina, San Juan, PR, for Alice Mercedes Lee–Crespo, plaintiff.

Luis F. Antonetti–Zequeira, Angel L. Berberena–Feliciano, Goldman Antonetti & Cordova, San Juan, PR, for Schering–Plough Del Caribe Inc., defendant.

### OPINION AND ORDER

LAFFITTE, Chief Judge.

Before the Court is a motion for summary judgment by Schering Plough del Caribe, Inc. Schering is a pharmaceutical company with a sales force in Puerto Rico. Plaintiff Alice Lee Crespo ("Lee") is a former member of that sales force. She claims to have been a victim of sexual harassment and seeks damages pursuant to Title VII of the Civil Rights Act of 1964.[1] She also brings Puerto Rico law claims under the Court's supplemental jurisdiction.

In ruling on the motion for summary judgment, the Court reviews the record in the light most favorable to Lee and draws

---

1. 42 U.S.C.A. §§ 2000e—2000e–17 (West 1994 & Supp.2002).

all reasonable inferences in her favor. *See LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 841 (1st Cir.1993). Lee began working as a professional sales representative for Schering in April 1999.[2] She was assigned to the Hato Rey area of San Juan, where she was responsible for visiting doctors to promote Schering's products.[3] In July 1999, Mayra González became Lee's immediate supervisor.[4] Lee claims that González subjected her to a hostile work environment. A few days after González became Lee's supervisor, the two were at a dermatologists' convention. During a break, González told Lee, "you know that now I'm your supervisor and now you have to do what I tell you to do."[5] In that same conversation, González made comments to Lee about the sexual preferences and private lives of other employees in the company. González told Lee that she (Lee) should become her best friend in the company and that Lee should tell her everything that happened. González also told Lee that if she ever had a problem she should tell González about it and that she should not go to Anita Bursian, who was González' supervisor. Lee perceived this comment as a threat.[6]

Lee's litany of offensive conduct by González includes the following:

●González repeatedly asked Lee how, as a rookie, she got herself assigned to the Hato Rey territory, which was considered to be lucrative for having a high concentration of doctors. González later told Lee that she had been assigned to this territory because Robert Mercadé, Schering's general manager, was crazy about her looks.[7]

●González said to Lee that she heard that Lee and María Montalvo, another Schering employee assigned to the same area as Lee, got along well.[8]

●González repeatedly "sized up" Lee and asked her where she got her jewelry.[9]

●González asked Lee whether she liked any of the doctors in her territory or if she ever dated doctors.[10]

●González told Lee that she was very disorganized and that was probably why she was not married. When Lee responded that she was organized, González commented that perhaps Lee had never married because she was "strange."[11]

●González repeatedly told Lee, "I know your background." Lee interpreted this comment to mean that González knew that Lee and María Montalvo were not close friends.[12]

●When Lee received her first commissions check, González called to observe that now Lee made more money than she did and to ask when was Lee going to take her out to eat. Lee told her that she was busy and hung up the phone.[13]

●In August 1999, all Schering employees were staying at a hotel for a company convention. During a meeting a co-worker complained that she was suffering from migraines. Lee said that she

2. Docket no. 13, exhibit 5.

3. Docket no. 1, ¶ 14.

4. Docket no. 1, ¶ 15.

5. Docket no. 18, exhibits 6 & 7.

6. Docket no. 18, exhibits 6–9, 12, 16, & 17.

7. Docket no. 18, exhibits, 10, 11, & 13.

8. Docket no. 18, exhibits 10 & 11.

9. Docket no. 18, exhibit 14 & 22.

10. Docket no. 18, exhibit 14.

11. Docket no. 18, exhibits 15, 23, & 24.

12. Docket no. 18, exhibit 18; docket no. 23, exhibit 8.

13. Docket no. 18, exhibits 18 & 19.

had some migraine medicine in her room. González asked for the keys to Lee's room so that she could go get the medicine. Lee declined and instead went to get the medication herself.[14]

●In October 1999, González called Lee and said in a scolding tone, "What is it with you, don't you like dermatologists?" During that same call, González accused Lee of having a negative attitude and told her that if she did not improve her attitude, González would change her to a different territory.[15]

●In October, González called Lee and asked her to get some medications from a doctor and to bring it by her house. Lee did so. González was cooking dinner when Lee arrived. She invited Lee to join her, but she declined. González proceeded to talk about Anita Bursian's love life. González also said that she wished she were tall and blonde like Lee and that Lee was "enviably thin." [16]

●In October, González, Lee, and other co-workers were together in a restaurant. González said to Lee in front of the other persons present that she had heard that Lee had been "crawling drunk" at a co-worker's wedding the past weekend. González made a similar comment to other co-workers at the office.[17]

●In October, González called Lee to tell her that she was supposed to sign an inventory form and that she should have learned this during her training. Of the group of new employees, Lee was the only one that González called to discuss this matter. Later, González sent a voice mail to the entire group informing them that a signature was necessary.[18]

●At a meeting, González looked at Lee in a "very intimidating way" and asked her why she would look down.[19]

●González repeatedly told Lee that she was a mediocre employee and that Lee sold with her good looks, not with her brains.[20]

●In December 1999, González called Lee to tell her that she had to work until December 23 before taking a holiday vacation. When Lee called the company's human resources department, however, they told her that she could take her vacation starting on December 17, the date when all the sales representatives began their holiday break.[21]

●In January 2000, Lee was out sick for four days. During her absence, González called and paged her repeatedly. She expressed doubts about her condition and ordered Lee to fax her a doctor's certificate that she was in fact sick. Company policy did not require a certificate until after the employee had returned to work.[22]

●In late January and early February, Schering had a convention for all its employees at a hotel in New Orleans. During the convention, Lee felt ill. She approached González to tell her that she was not feeling well and that she was going to go up to her room to use the bathroom. González looked at her from head to toe and said, "Are you afraid of

14. Docket no. 18, exhibits 19—21.

15. Docket no. 18, exhibits 25 & 26; docket no. 1, ¶ 22.

16. Docket no. 18, exhibit 27; docket no. 23, exhibits 15 & 16; docket no. 1, ¶ 23.

17. Docket no. 18, exhibits 29 (translation at docket no. 30) & 30—33; docket no. 23, exhibit 18.

18. Docket no. 18, exhibits 33–35; docket no. 23, exhibit 24.

19. Docket no. 18, exhibit 36.

20. Docket no. 18, exhibit 37.

21. Docket no. 18, exhibits 41 & 42.

22. Docket no. 18, exhibits 42 & 43.

me?" When Lee returned, González gave her "dirty looks."[23]

●At the national convention, González approached Lee and told her that she never wears skirts, that she looked sexy in them, and that she should wear them more often.[24]

●In February 2000, González told Lee to attend a pediatricians' convention that was going to be held on the following day, which was a regular working day. Lee worked at the convention.[25]

●At the convention, González approached Lee, hugged her from behind, and asked her to bring her a cookie from a booth of one of the other companies at the convention.[26]

●In February, Lee told Bursian that she wanted to transfer to Schering's offices in Florida. Bursian and González gave her the phone numbers of the people to contact. Through these contacts, Lee was able to get an interview in Florida. She received a tentative offer. González told Lee, "I cannot wait until you leave."[27]

●In March 2000, just before a meeting between Lee and her supervisors to discuss her complaints about González, González suggested to her that she resign.[28]

In March, Lee asked Mercadé, the general manager, for a meeting to discuss her problems with González. On March 13, a meeting was held with González, Mercadé,

Bursian, and Myrna Burgos, the human resources director. At the meeting, Lee complained of González' treatment towards her. She claimed that González was harassing her, but Lee did not specify that she felt she was being sexually harassed. Lee requested that she be given a new supervisor.[29] During the meeting Lee also said she wanted a transfer to Florida, but Mercadé said that no one would get a transfer without his permission.[30] Lee claims that before she could assert that González' harassment was sexual, González interrupted with her own complaints about Lee's work performance. She claimed, among other things, that Lee did not always respond to her pages, that she had taken more vacation days than she had accumulated, and that she had failed to comply with administrative duties.[31] At the meeting, it was decided to change Lee's territory and supervisor, although she claims that she did not agree to this decision.[32] Her concern with a change in territory was that she would be promoting products whose potential for commissions was lower than the products she was promoting in the Hato Rey territory.[33] The meeting ended without Lee ever claiming that she was a victim of sexual harassment.[34]

At the end of March, Lee was given a 2.3 percent raise in her salary, to take effect the first of April.[35] Also effective on this same date, Lee was to have a new

---

23. Docket no. 18, exhibits 44—46.

24. Docket no. 18, exhibit 47.

25. Docket no. 18, exhibits 48—49.

26. Docket no. 18, exhibit 50.

27. Docket no. 18, exhibits 51—54.

28. Docket no. 18, exhibits 62—63.

29. Docket no. 18, exhibits 56, 57, & 59.

30. Docket no. 18, exhibit 60.

31. Docket no. 18, exhibits 57 & 77 (translation at docket no. 30).

32. Docket no. 13, exhibit 14 (translation at docket no. 26); docket no. 18, exhibits 60 & 77 (translation at docket no. 30).

33. Docket no. 18, exhibits 60 & 61.

34. Docket no. 18, exhibits 57 & 59.

35. Docket no. 18, exhibit 75.

supervisor.[36] Two days before she was to start with a new supervisor, her treating psychiatrist issued a medical certificate recommending that she be given medical leave to rest until May 17.[37] On April 4, Dr. Gerena, a Schering physician, examined Lee and suggested to her that she leave the company.[38] On April 5, Schering employees took the medical samples that had been entrusted to Lee. Burgos called Lee on that date to tell her that the company was taking the samples because she wanted her to resign. Burgos offered Lee three months' salary and six months' coverage in the health plan if she would quit.[39]

On May 1, Burgos sent Lee a letter stating that she had asked Lee to provide certain documents, including a list of the physicians in her territory, "profile cards" of the physicians, and a certificate from her treating psychiatrist that she was fit to drive the company car. Burgos stated that the company had requested this information from Lee on several occasions; that she should provide Schering with the information by May 3; and that if she did not produce a certificate from her psychiatrist, she would have to return the company car she was using.[40] In May, before the nineteenth of the month, Schering took Lee's company car away from her.[41]

On May 19, Lee's psychiatrist issued a second certificate recommending that she be put on medical leave to rest indefinitely.[42] Lee stopped working in March. She did not receive commissions for the months of February and March. She

asked Burgos and Bursian to explain why not, but they did not answer her question.[43] On June 30, Lee submitted a letter of resignation. The letter stated that management's oppressive and burdensome treatment had left her with no alternative but to resign.[44]

Lee claims to have been the victim of both hostile work environment and *quid pro quo* sexual harassment. She also claims to have been constructively discharged on the basis of her gender. In its motion for summary judgment, Schering argues that it did not sexually harass or constructively discharge Lee. Lee has opposed the motion for summary judgment. For the reasons set forth below, the Court grants Schering's motion.

## DISCUSSION

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party has satisfied this requirement, the nonmoving party has the burden of presenting any facts that demonstrate a genuine issue for trial. Fed.R.Civ.P. 56(e); *LeBlanc,* 6 F.3d at 841. The nonmovant must do more than

36. Docket no. 13, exhibit 14 (translation at docket no. 26).

37. Docket no. 13, exhibit 16 (translation at docket no. 26); docket no. 18, exhibit 69.

38. Docket no. 18, exhibits 66 & 67.

39. Docket no. 18, exhibits 70—72.

40. Docket no. 18, exhibit 76 (translation at docket no. 30).

41. Docket no. 18, exhibits 68—70.

42. Docket no. 13, exhibit 17 (translation at docket no. 26); docket no. 18, exhibits 69 & 71.

43. Docket no. 18, exhibits 73 & 74.

44. Docket no. 18, exhibit 78 (translation at docket no. 30).

show "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). An issue is genuine when, based on the evidence, a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512.

### 1. Hostile work environment claim

Title VII makes it unlawful for an employer to discriminate against an employee with respect to her terms and conditions of work because of the employee's race, color, sex, national origin, or religion. 42 U.S.C.A. § 2000e–2(a). Harassment is a form of discrimination prohibited by this statute. *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir.2001). A claim of harassment will generally proceed under one of two theories: *quid pro quo* claims and hostile work environment claims. *See Burlington Industries v. Ellerth*, 524 U.S. 742, 751–52, 118 S.Ct. 2257, 2264, 141 L.Ed.2d 633 (1998). Lee claims to be the victim of both types of harassment.

In determining whether a plaintiff has an actionable hostile work environment claim, a court must "look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 2074, 153 L.Ed.2d 106 (2002) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993) (internal quotations

omitted)); *Marrero v. Goya of Puerto Rico*, 304 F.3d 7, 18–19 (1st Cir.2002). For the claim to proceed, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Morgan*, 536 U.S. at ——, 122 S.Ct. at 2074 (quoting *Harris*, 510 U.S. at 21, 114 S.Ct. at 370) (internal quotations omitted); *O'Rourke*, 235 F.3d at 728. There is no "mathematically precise test" to determine when conduct goes from being merely offensive to creating a hostile work environment. *Harris*, 510 U.S. at 22–23, 114 S.Ct. at 370–71; *Marrero*, 304 F.3d at 18. A plaintiff must show that the harassment was so severe and pervasive that it altered the terms of her employment and created a work environment that a reasonable person would find to be hostile or abusive and that the plaintiff did in fact perceive to be so. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786–87, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998); *Marrero*, 304 F.3d at 16; *Landrau Romero v. Caribbean Restaurants, Inc.*, 14 F.Supp.2d 185, 190 (D.P.R.1998).

That is not to say that every offense or slight in the workplace will give rise to a harassment claim. "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271, 121 S.Ct. 1508, 1510, 149 L.Ed.2d 509 (2001) (quoting *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2283 (internal citations omitted)). The standard for establishing a hostile work environment must be sufficiently demanding so as to ensure that Title VII will not become a general code of civility in the workplace. *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2283–84; *O'Rourke*, 235 F.3d at 729; *Baskerville v. Culligan Int'l Co.*,

50 F.3d 428, 430–31 (7th Cir.1995). A court should filter out complaints on " 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.' " *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2284 (quoting B. Lindemann & D. Kadue, *Sexual Harassment in Employment Law* 175 (1992)). " 'The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins.' " *Marrero*, 304 F.3d at 19 (quoting *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir.2000)). The alleged harassment must be extreme in nature for it to constitute a change in the terms and conditions of employment. *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2284.

In the present case Lee claims that she was harassed by her female supervisor. A hostile work environment claim may proceed in the case where the plaintiff and her putative harasser are of the same sex. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79, 118 S.Ct. 998, 1001–02, 140 L.Ed.2d 201 (1998). A factfinder could find sex discrimination when a female plaintiff is harassed "in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." *Id.* at 80, 118 S.Ct. at 1002. Title VII does not cover "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex." *Id.* at 81, 118 S.Ct. at 1002–03. The law is not a mandate that the workplace be completely androgynous and asexual. *Id.* at 81, 118 S.Ct. at 1003. The plaintiff must always prove that the alleged harassing conduct was not just marked by "offensive sexual connotations," but also amounted to discrimination because of sex. *Id.* at 81, 118 S.Ct. at 1002. Thus, the critical issue becomes whether a member of one sex was exposed to disadvantageous terms and conditions of employment to which the members of the other sex were not. *Id.* at 80, 118 S.Ct. at 1002; *O'Rourke*, 235 F.3d at 735.

With these precepts as a background, the Court examines the incidents which Lee claims constituted sexual harassment. One group of incidents constitutes wholly innocuous behavior: González' saying that Lee and Montalvo got along well; González asking for the keys to Lee's hotel room so that she could go get migraine medicine; González' telling Lee that she had to sign an inventory form; and González' making Lee work at a pediatricians' convention scheduled for the next day. It is not the type of conduct that a reasonable person could find hostile or abusive. *See Faragher*, 524 U.S. at 787, 118 S.Ct. at 2283.

A second group of incidents is, at worst, made up of boorish or overbearing behavior by González: her telling Lee that now that she was her boss, Lee would have to do what she told her to do; her telling Lee that she should treat González as her best friend in the company and tell her everything that happened; her asking Lee how she got assigned to the Hato Rey territory when she was only a rookie; her telling Lee that she knew her background; her calling Lee to say that she would have to take González out to eat; her scolding Lee for having a negative attitude and for not liking dermatologists; her telling co-workers that Lee had been drunk at a wedding; her looking at Lee in an intimidating way; her trying to make Lee work an extra week in December; her insisting that Lee provide a medical certificate for her absence in January 2000; her asking Lee at the convention in New Orleans whether she was afraid of her, and then giving her "dirty looks;" her telling Lee that she could not wait until she left the company; and her suggesting to Lee that she quit. All these incidents may be evi-

dence that Gonzáles was impolitic. They are not, however, indicia of discrimination because of sex.

■■■ The Court is mindful that conduct cannot be measured in isolation and that a work environment is to be judged by looking at *all* the circumstances. *See Clark County,* 532 U.S. at 270, 121 S.Ct. at 1510. Furthermore, a court should, in a hostile work environment claim, refrain from segregating the challenged conduct between that which is tainted by a discriminatory animus and that which is merely unequal treatment and then discounting the latter category of conduct. *See O'Rourke,* 235 F.3d at 730. Therefore, the Court considers the above-mentioned incidents in conjunction with the following alleged incidents of harassment: Gonzáles' talking to Lee about the sexual preferences and private lives of her co-workers; her telling Lee that she was assigned to Hato Rey because the general manager was "crazy about her looks;" her sizing up Lee and asking her where she bought her jewelry; her asking Lee if she liked her doctors or if she ever dated doctors; her telling Lee that she had not married because she was disorganized and commenting that perhaps Lee was "strange;" her telling Lee that Gonzáles wished she were tall and blonde like Lee and that she (Lee) was enviably thin; her telling Lee that she sold with her looks, not with her brains; and her hugging Lee at a convention and asking her to bring her a cookie.

■■ This third group of incidents contains conduct or comments that have, at the very least, some sexual tint or connotation. That is not, in and of itself, enough to make the conduct actionable. *See Oncale,* 523 U.S. at 81, 118 S.Ct. at 1003 (Title VII "requires neither asexuality nor androgyny in the workplace."). The alleged harassment must be extreme in nature for it to constitute a change in the terms and conditions of employment. *Faragher,* 524

U.S. at 788, 118 S.Ct. at 2284; *see, e.g., Crowley v. L.L. Bean, Inc.,* 303 F.3d 387, 397–99 (1st Cir.2002) (Co-worker created hostile work environment when he grabbed and massaged plaintiff's foot against her will at a company party; continually followed her at work, even though they did not work in the same area; physically blocked her path in aisles, thereby forcing her to squeeze by him; waited in the dark for her to come upon him; followed her home; peered into windows of her house; and broke into her home); *Marrero,* 304 F.3d at 19–20 (Supervisor made humiliating sexual remarks to plaintiff on a daily basis, discussed her appearance with co-workers, and subjected her to unwelcome physical touching). Lee must establish that her workplace was permeated with discriminatory intimidation, ridicule, and insult which was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. *See Morgan,* 536 U.S. at ——, 122 S.Ct. at 2074.

Gonzáles' conduct was not so sever or pervasive that it altered Lee's terms and conditions of employment. Although some of her comments may have been lacking in professionalism and common courtesy, her conduct as a whole was not the type of conduct that a reasonable person would find hostile or abusive. *See Faragher,* 524 U.S. at 787, 118 S.Ct. at 2283. Rather, it rises only to the level of sporadic abusive language, gender-related jokes, and occasional teasing. Such conduct does not generally create a hostile work environment. *See id.* at 788, 118 S.Ct. at 2284. The Court emphasizes that it does not consider Gonzáles' conduct to be laudable. Indeed, some of it—discussing the private lives of co-workers; asking Lee why she had never married; telling co-workers that Lee had been drunk at a wedding, to mention but a few examples—is rather boorish. Title VII is not, however, a gen-

eral code of civility in the workplace. *Id.* at 788, 118 S.Ct. at 2283–84. The actions by González may have been annoying, but they were not so sever to rise to the level of an actionable sexual harassment claim. *Cf. Baskerville,* 50 F.3d at 430–31 (Vulgar banter tinged with sexual innuendo does not, by itself, give rise to a sexual harassment claim); *Landrau Romero,* 14 F.Supp.2d at 191 (collecting cases in which court found that unpleasant behavior did not rise to sever or pervasive level).

Moreover, Lee must prove that the alleged harassment amounted to discrimination because of sex. *See Oncale,* 523 U.S. at 81, 118 S.Ct. at 1002. There is no evidence or indication that González' treatment of Lee was motivated by a general hostility to the presence of women in the workplace. While some of her comments may have had a sexual tint, that is not to say that they were necessarily indicative of a discriminatory attitude or hostility on González' part towards women. *See Landrau Romero,* 14 F.Supp.2d at 190 (Although supervisor's comments were sexual in nature, they were not discriminatory). Rather, many of her comments are best categorized as inappropriate gossiping or prying. This is simply not sufficient to support a claim of sexual harassment.

■■■ The Court again emphasizes that it has analyzed the evidence as a whole and has considered all of the alleged harassing conduct together. This evidence is not sufficient to support a claim that Lee was subject to a sever or pervasive hostile work environment. Therefore, based on all of the above, the Court finds that there is no genuine issue of material fact as to Lee's hostile work environment claim. Accordingly, the Court grants Schering's motion for summary judgment on this claim.[45]

### 2. Quid pro quo claim

■■■ In her complaint, Lee alleges that she was also the victim of *quid pro quo* harassment. This type of harassment occurs when a supervisor makes an employment benefit or adverse action dependent upon the plaintiff's complying with demands for sexual favors. *Hernandez–Loring,* 233 F.3d at 52; *Wills v. Brown University,* 184 F.3d 20, 25 (1st Cir.1999). There is no evidence in the record that González or any other supervisor used a threat of employment benefits in exchange for sexual favors. There being no genuine issue on this matter, summary judgment dismissing this claim is appropriate.

■■■ Dismissal of this claim appears warranted for a second reason. In her opposition to the motion for summary judgment and in her portion of the pretrial order, Lee speaks only of hostile work environment harassment.[46] Thus, to the extent that she was bringing a *quid pro quo* claim originally, it is hereby waived.[47] The Court therefore enters summary judgment dismissing this claim.

### 3. Constructive discharge claim

■■■ Lastly, Lee brings a claim for constructive discharge. A worker has

---

**45.** Lee is also bringing sexual harassment claims under the comparable Puerto Rico statute on this topic. *See* 29 P.R. LAWS ANN. §§ 155—155*l* (1995). Federal and Puerto Rico laws on sexual harassment are closely aligned, such that Title VII case law is often used to interpret the Puerto Rico statute. *Hernandez–Loring v. Universidad Metropolitana,* 233 F.3d 49, 52 (1st Cir.2000). Accordingly, the Court dismisses Lee's parallel Puerto Rico law hostile work environment claim for the same reasons, discussed above, that it dismisses her Title VII hostile work environment claim.

**46.** Docket no. 18, at 10–14; docket no. 43, at 10–11.

**47.** Any Puerto Rico law claims for *quid pro quo* harassment are also dismissed. *See* footnote 45, above.

been constructively discharged when she is subjected to "treatment so hostile or degrading that no reasonable employee would tolerate continuing in the position." *Melendez–Arroyo v. Cutler–Hammer de Puerto Rico Co.*, 273 F.3d 30, 36 (1st Cir. 2001). A plaintiff claiming such treatment must show that her working conditions were so unpleasant or difficult that a reasonable employee in that position would have felt compelled to resign. *Marrero*, 304 F.3d at 28; *Landrau–Romero v. Banco Popular De Puerto Rico*, 212 F.3d 607, 613 (1st Cir.2000). There must be evidence to allow the factfinder to conclude that the conditions were so unbearable that continuing in the position while attempting to seek redress would have been intolerable. *Marrero*, 304 F.3d at 28. This is an objective standard. The employee's own subjective beliefs, no matter how sincerely held, will not establish a constructive discharge. *Id.* Moreover, workers are expected to have thick skins. The constructive discharge standard does not ensure a workplace "free from the usual ebb and flow of power relations and inter-office politics." *Suarez*, 229 F.3d at 54.

 In the present case, the Court reviews Lee's constructive discharge claim in light of all the evidence, including both the alleged harassment by González, as well as Lee's allegations of mistreatment by the rest of the Schering management. *See Marrero*, 304 F.3d at 28–29. Even viewed in this light, however, the record does not create a genuine issue on this matter. Lee had complained that González was harassing her. A court's assessment of whether an employee in Lee's position was constructively discharged should take into account the employer's response to the employee's complaints of harassment. Whether a reasonable employee would feel compelled to resign will depend on the likelihood that she would have to continue to endure the harass-

ment. *See id.* at 28. Here, Schering responded to Lee's complaints of harassment by holding a meeting with her and her supervisors. As a result of this meeting, Lee was assigned a new territory and a new supervisor. There is nothing in the record to indicate that after this change in supervisors González would continue to interact with Lee. Thus, it appears that Schering took steps to ameliorate the condition which Lee found to be offensive. This response by Schering is not indicative of a situation in which a reasonable employee would feel compelled to resign.

In *Marrero*, a recent First Circuit case, it was held that an employee was constructively discharged even though the employer had removed her from a supervisor who had been sexually harassing her. *See id.* at 27–29. In that case, although the employee had been given a new supervisor, her old supervisor still had his office near her desk and she continued to interact with him regularly. *Id.* at 28–29. The Court concluded that a jury could have found that this transfer actually made things worse for the plaintiff because her previous supervisor continued to harass her and began to taunt her for her unsuccessful attempts to remedy the situation. *Id.* at 29. The Court held that the inadequacy of this transfer in the face of plaintiff's long history of enduring hostility and complaining about such treatment could have lead plaintiff to reasonably believe that the only way she could avoid this harassment would be to resign. *Id.* By contrast, in the present case once Lee voiced her complaints about what she felt was harassing behavior by González, Schering changed her supervisors. There was no evidence that Lee had to continue to interact with González after this change was made.

Another aspect of the transfer mitigates against a finding of constructive discharge.

Two days before Lee was scheduled to begin working with a new supervisor, she took medical leave. She was on this leave until she finally resigned. Thus, she never worked under her new supervisor. A plaintiff that quits before trying out a new position will be hard pressed to establish that this new position compelled her to resign. *Serrano–Cruz v. DFI Puerto Rico, Inc.,* 109 F.3d 23, 26 (1st Cir.1997). In the present case, there is no evidence that Lee's supervisor would have subjected her to the same treatment that she was exposed to under González.

In her opposition to the motion for summary judgment, Lee claims that she continued to be harassed while she was on sick leave. She lists as harassment Schering's taking away her company car, company cellular telephone, company inventory, and other company documents. She also complains that Schering scheduled an appointment for her with Dr. Gerena, a Schering physician.[48] It does not strike the Court as unreasonable that a company would retrieve its equipment, such as an automobile and inventory, from an employee who is on medical leave and unable to use them. This may have been unpleasant for Lee, but it did not create an intolerable working condition. Furthermore, it is not unreasonable for a company to refer an ill employee to a company physician. Perhaps Lee was inconvenienced by this appointment. It does not, however, support a claim of constructive discharge.

Lee also complains that in her new territory she would be receiving less commissions than she had in Hato Rey. This may or may not be true. However, because she never worked in the territory, it is unclear how much—if at all—such a reduction would be. Moreover, effective April 1, 2000, Lee was given a raise. This took effect during the time that she claims she was being subjected to conditions so unbearable that she was compelled to resign.

The record as a whole does not indicate that Lee was subject to treatment so hostile or degrading that a reasonable employee would feel compelled to resign. Lee's primary grievance in this case is González' conduct. Following the meeting of March 13, 2000, Schering responded to this grievance by assigning Lee to a new supervisor, thereby removing the chief source of Lee's complaint. The conduct of which Lee complained while she was on medical leave consisted of conduct by Schering employees dealing with administrative matters: for example, asking her for information on physicians, taking away her company automobile, and sending her to a company physician for an examination. These actions may have been annoying to Lee, but they strike the Court as reasonable conduct by a company faced with an

---

48. Docket no. 18, at 7–8 n. 3. In her opposition, Lee also alleges that González called her at home to request unspecified reports. There is, however, no evidence in the record to indicate that González did in fact do this. The record *does* contain a memorandum from Burgos to Lee demanding that she provide the company with a list of the physicians in her territory, "profile cards" of the physicians, and a certificate from her treating psychiatrist that she was fit to drive the company car. Docket no. 18, exhibit 76 (translation at docket no. 30). Such a request from Burgos does not create a condition so unbearable that Lee would be compelled to resign.

Lee's statement of contested facts also alleges that González called Lee to her office to tell her that she was being reassigned to a new territory as punishment. Docket no. 18, Statement of Contested Fact # 55. However, the evidence to which the statement of fact cites in the record does not support this allegation. The cited evidence only makes reference to the fact that Lee was assigned to a new territory. Nowhere does it say that González told her that this was being done as a punishment. *See* docket no. 18, exhibits 60 and 61.

employee who was unable to work because of a medical condition. The actions by all Schering supervisors as a whole did not create a workplace environment so hostile that a reasonable employee would have felt compelled to resign. Therefore, the Court finds that there is no genuine issue as to Lee's claim of a constructive discharge.[49] Her parallel Puerto Rico law claims for constructive discharge are also dismissed.[50]

WHEREFORE, the Court hereby **grants** Schering's motion for summary judgment (docket no. 13). Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

---

**49.** As an additional point in support of the dismissal of the constructive discharge claim, the Court notes that proof of a constructive discharge claim requires a degree of harassment *higher* in severity or pervasiveness than that required for a hostile work environment claim. *See Marrero,* 304 F.3d at 28; *Woods v. Delta Beverage Group, Inc.,* 274 F.3d 295, 301 (5th Cir.2001); *Hipp v. Liberty Nat'l Life Ins.,* 252 F.3d 1208, 1231 (11th Cir.2001). As discussed in Part 1 above, Lee has failed to establish that she was subject to a hostile work environment. For the reasons discussed above, she has also failed to show that she was constructively discharged.

**50.** Puerto Rico law on what constitutes a constructive discharge is virtually identical to the federal law standard. *See Vélez De Reilova v. R. Palmer Bros., Inc.,* 94 P.R.R. 166, 169–70 (1967); *Landrau Romero,* 14 F.Supp.2d at 193; *Flamand v. Am. Int'l Group, Inc.,* 876 F.Supp. 356, 369 (D.P.R.1994). Therefore, for the same reasons, discussed above, that the Court grants summary judgment on Lee's Title VII constructive discharge claim, the Court also grants summary judgment on the parallel local law claim.