# United States Court of Appeals
## For the First Circuit

No. 03-1033

ALICE MERCEDES LEE-CRESPO,

Plaintiff, Appellant,

v.

SCHERING-PLOUGH DEL CARIBE INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, Chief U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella and Lynch, Circuit Judges.

Angelique Doble Bravo, with whom José A. Gallart and Cristina Alcaraz Emmanuelli were on brief, for appellant.
Luis F. Antonetti, with whom Angel L. Berberena, Jesús Cuza, and Goldman Antonetti & Córdova PSC were on brief, for appellee.

December 31, 2003

**LYNCH**, **Circuit Judge**.  This is a same-sex employment discrimination case in which plaintiff Alice Mercedes Lee-Crespo seeks to hold her employer vicariously liable primarily for the actions of her supervisor.  The appeal is from the grant of summary judgment to Schering-Plough Del Caribe, Inc., the employer.  Lee-Crespo claims that she was subjected to a hostile work environment and constructively discharged as a result of sexual harassment by her immediate supervisor, a female, in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e et seq., and Puerto Rico law.  The district court held that the undisputed material facts permitted the conclusion that the conduct of the supervisor was boorish and unprofessional, but that the incidents were not severe or pervasive enough to alter the terms and conditions of Lee-Crespo's employment, and that Lee-Crespo was not constructively discharged.  Crespo v. Schering Plough Del Caribe, Inc., 231 F.Supp.2d 420, 429, 433 (D.P.R. 2002).

A jury could easily find that Lee-Crespo was subjected to incivility.  But Title VII is neither a civility code nor a general anti-harassment code.  Title VII requires, rather, that the level of incivility or harassment must amount to either a tangible or a constructive employment action.  Furthermore, the alleged harassment and the employment action must be causally related.  The discrimination must be based on gender or some other prohibited category.  Here, Lee-Crespo complains of a general atmosphere of

harassment by her supervisor that she argues was so bad it drove her out of her job and was a constructive discharge. She fails to show that the harassment she suffered amounted to a constructive discharge. She also complains that her failure to get a transfer to Florida and her reassignment to a new sales territory in Puerto Rico were tangible employment actions. But those decisions were not made by her supervisor, but by her supervisor's superiors, none of whom participated in any harassment. Indeed, as to the reassignment, these upper level supervisors were being responsive to Lee-Crespo's statements that she did not want to work with her supervisor. There is nothing showing a causal link between any alleged harassment and the motivation of the non-harassing managers in these decisions. As a result, we affirm.

**I.**

On appeal from the entry of summary judgment, this court views the facts in the light most favorable to Lee-Crespo and draws all reasonable inferences in her favor. <u>Rivera</u> v. <u>P.R. Aqueduct & Sewers Auth.</u>, 331 F.3d 183, 185 (1st Cir. 2003).

Lee-Crespo provided the following account in her deposition. On April 28, 1999, she began training with Schering-Plough (Schering), a pharmaceutical company, and on May 19, she began working as an entry level medical salesperson. She had no prior experience in the medical sales field. Lee-Crespo was initially assigned to visit doctors in the Hato Rey area of San

Juan, Puerto Rico, but nothing in her employment offer guaranteed her a specific sales area. Hato Rey has a high concentration of physicians.

Mayra González was promoted from being a sales representative to the position of district manager in June 1999 and became Lee-Crespo's immediate supervisor in July 1999. Thus, a neophyte manager, González, came to supervise a neophyte sales representative, Lee-Crespo. About thirteen other employees also worked under González's supervision. On July 4, 1999, González told Lee-Crespo: "[Y]ou know that now I'm your supervisor and now you have to do what I tell you to do." González also told Lee-Crespo that she should never go to González's boss, Anita Bursian, with a problem. The same day, González made comments to Lee-Crespo regarding the private lives and sexual preferences of other Schering employees. González said that she did not get along with her ex-boss, whom she said was a lesbian and treated her badly, and she discussed a Schering employee who, although unmarried, had lived with and had a child with a doctor. Lee-Crespo's testimony was that González had many "stories" about co-workers.

González repeatedly questioned Lee-Crespo about how she, as a "rookie," had come to be assigned to the Hato Rey territory. At one point, González told Lee-Crespo that the reason she was assigned there was that Schering's general manager, Roberto Mercade, was "crazy about [her] looks." González advised Lee-

-4-

Crespo that she should become González's best friend in the company and should tell her everything that happened at Schering. After Lee-Crespo earned a large commission, González told Lee-Crespo to invite her to lunch because Lee-Crespo earned more money than she did. Lee-Crespo declined and González never asked her again.

González also bothered Lee-Crespo with meddlesome and prying questions about her personal life and made comments about her appearance and behavior. González asked Lee-Crespo for the names of the stores where she bought her clothes and accessories. González also asked for Lee-Crespo's opinion about the doctors she visited and inquired whether she ever dated doctors. González once told Lee-Crespo that she had always wanted to be tall and blonde like her and commented that Lee-Crespo was "enviably thin."

The relationship had its ups and downs. At times friendly, González was also critical of Lee-Crespo. González accused Lee-Crespo of being very disorganized and said that her disorganization probably explained why she did not have a husband. González also told her that she was a mediocre sales representative and stated that she was using her physical attributes, not her technical knowledge, to sell Schering's products. Lee-Crespo said that González often looked at her "in a very intimidating way." At one point, González said "You have never married because maybe

-5-

you're strange, "rara"?"[1]  González commented that Lee-Crespo and María Montalvo, one of Lee-Crespo's co-workers, would be able to have lunch together frequently and that she had heard that Lee-Crespo and Montalvo got along very well.  More than once, González told Lee-Crespo that she did not appreciate the fact that she had a job as a sales representative for Schering.

In August 1999, while González and Lee-Crespo were at a hotel during a Schering convention, Anita Bursian complained about having a migraine headache.  When Lee-Crespo offered to get some medication from her hotel room, González asked Lee-Crespo for her bedroom keys and said that she would get the medication from Lee-Crespo's room.  Lee-Crespo refused to hand over her keys, and that was that.

On several occasions, Lee-Crespo complained about González to Anita Bursian, González's boss.  She first went to Bursian sometime between October and November 1999 and "told her everything."  But Lee-Crespo never explained on the record what this "everything" was.  Lee-Crespo also occasionally spoke critically to other fellow employees about González and about individual incidents.

---

[1]  Lee-Crespo interpreted this statement as an insinuation by González that Lee-Crespo was a lesbian.  In her sworn statement of particulars filed with the Anti-Discrimination Unit of the Puerto Rico Labor Department, Lee-Crespo stated that her co-workers asked her: "Could it be that [González] likes you?"

One day in October 1999, González told Lee-Crespo's co-workers that she had heard that Lee-Crespo was "crawling drunk" at a wedding. The accusation was untrue. When Lee-Crespo said that González was wrong and asked her to stop making the false statement, González backed off and told Lee-Crespo that she could not take a joke. On another occasion in October, González called Lee-Crespo and, in a loud voice and with a scolding tone, accused her of having a negative attitude and threatened to reassign her to a new territory. In December, González informed her that she would have to work during a week that was considered a holiday period for sales representatives. Lee-Crespo called Schering's personnel office and was advised that González could not require her to work the additional week. She did not work that week.

Still, a "Performance Development Plan" for Lee-Crespo, dated January 10, 2000, and signed by González, provided positive evaluations of Lee-Crespo's work. Among other things, the document notes Lee-Crespo's "[e]xcellent territory analysis," "[e]xcellent business development," "[e]xcellent communication skills," and "[g]ood administrative work, all reports on time."[2]

---

[2]    Elloy Pérez-Bracetti, a male district manager, testified that during the period when Lee-Crespo was supervised by González, he could not remember Lee-Crespo making any mistakes "out of the ordinary" and that there was "nothing negative that would lead us to say she was doing a poor job." When asked for his opinion of Lee-Crespo's performance as a sales representative, Pérez-Bracetti responded: "Well I found it to be fine, I found it to be normal. . . . I did not find anything in her that was negative to where I would have to reprimand her or anything like that."

On January 10, 2000, Lee-Crespo became sick with asthmatic bronchitis and took four days of sick leave from work. González called Lee-Crespo at home and paged her and expressed doubts regarding her illness. On January 12, González ordered her to fax a medical certificate evidencing her illness, even though company policy did not require the production of such a certificate until returning to work. At the end of that January, Lee-Crespo became sick with acute indigestion at Schering's national convention. When Lee-Crespo informed González that she was ill and excused herself, González replied, "are you afraid of me?" and asked that question "in a very disgusting way." Later during the same convention, González commented that Lee-Crespo almost never wore skirts, looked very sexy in skirts, and should wear them more often. At a pediatrician's convention in February 2000, González approached Lee-Crespo from behind, hugged her, and whispered in her ear a request for a cookie from another table.

In February, Lee-Crespo "told Anita Bursian that this was going so far, that [she] needed to go and that [she] wanted to leave this hostile environment so [she] needed a transfer." Lee-Crespo gave Bursian and González a letter for the human resources department indicating that she wanted a transfer, but they told her that she should deal with them, not with human resources. Bursian and González gave Lee-Crespo the numbers to call at Schering's offices in Florida to inquire about a transfer. Lee-Crespo was

interviewed in Florida and was, she says, tentatively accepted for a position there. After learning of Lee-Crespo's transfer request, González told Lee-Crespo several times that she could not wait for the day when Lee-Crespo would leave.

On March 8, Lee-Crespo requested an interview with Mercade, the general manager, who called a meeting for March 13. Before the meeting, González told Lee-Crespo that she should resign. Five people attended the meeting: Lee-Crespo, González, Mercade, Bursian, and Myrna Burgos (from the human resources department). Lee-Crespo testified that she told those present at the meeting:

> That [González] was harassing me, following me, calling me, staring at me, saying things to me . . . . I said everything, and when I was ready to tell them "hey, this is sexual harassment, I'm not going to take it", [González] interrupted . . . and started saying that I was a poor employee . . . . They said "we don't have to listen to you and this is it"; [then they] left . . . . [T]hey never let me talk.

During the meeting, González produced a job evaluation rating Lee-Crespo's performance as "poor." Lee-Crespo had no knowledge of that evaluation prior to the meeting.

Lee-Crespo testified that she raised the issue of her transfer to Florida at the meeting and that Mercade blocked the transfer, saying that "nobody can leave without telling me, nobody gets to transfer." Lee-Crespo said that when Mercade made that statement, Bursian and González became aware that they had made a

mistake in not realizing that all transfers had to go through Mercade.

A contemporaneous memo, dated March 14, 2000, from Myrna Burgos to the "Personnel File" describes the March 13 meeting as follows. Burgos refers to the purpose of the meeting as "to listen about [Lee-Crespo's] complaint of harassment" by González. At the meeting, Lee-Crespo "read a long list of incidents and comments connected with her uneasiness and her relationship with her supervisor." Among Lee-Crespo's primary allegations were González's constant threats of reassignment to a new territory, González's accusations of disorganization and insecurity, González's prohibitions against her talking directly with Bursian, and González's meddling in her personal life. Lee-Crespo also alleged that other workers in the Hato Rey territory felt equally pressured but did not dare to talk about it.

The memo recites that González responded by saying that Lee-Crespo did not exhibit "teamwork, communication, pri[d]e and commitment." González noted that territory changes are frequent at Schering, and she complained, among other things, that Lee-Crespo did not always respond to her beeper, did not always communicate her absences, had taken vacation in excess of her accrual, arrived late, had low medical coverage, bad-mouthed González to other people and bad-mouthed co-workers to González, failed to fulfill certain administrative duties, and had not demonstrated a

-10-

commitment to the company.[3]  The memo notes that Bursian spoke at the meeting as well, but it does not document what she said.

The memo summarizes the outcome of the meeting:

> After listening to both parties and to . . . Anita Bursian, we conclude that many of the situations stated [have] been the result of lack of positive and constructive communication among the parties, and communication of Ms. Lee in the improper forums . . . . Ms. Lee was reminded that her lack of compliance with administrative matters had repercussions in other departments, and that it was the supervisor's duty to point out to her the areas where her performance could improve . . . .

Burgos's memo also confirms that Lee-Crespo requested a new supervisor at the meeting and was told that making such a change was not customary but could be accomplished by moving her to another territory.  González told Lee-Crespo that she could continue to work for her.  The memo notes that Lee-Crespo had repeatedly requested that she not be reassigned to a new territory, but indicates that she did accept the change in territory offered to her at the meeting.

A different memo from Burgos to the personnel file memorializes a meeting between Burgos and Lee-Crespo that occurred on March 14, the day after the five-person meeting, at Lee-Crespo's request.  Burgos writes:

> [Lee-Crespo] was greatly dismayed and tearful over the result of the group meeting because it was her perception

---

[3]     In her sworn statement of particulars, Lee-Crespo stated that González said at the meeting that her prior comment regarding Lee-Crespo's drunkenness at the wedding was intended as a joke.

we had "gotten off on a tangent" on the matter of her compliance with the administrative portion of her work . . . . I asked her what it was she expected, and she told me she had been the victim of abuse on the part of [González], and that she expected us to reprimand [González] . . . .

During the meeting, Burgos told Lee-Crespo that "the change in territory eliminated the harassment situation she was alleging." Lee-Crespo admitted to Burgos that she had failed in certain areas of her job that were pointed out during the previous day's meeting. Lee-Crespo also told Burgos that she was extremely lonely, had gone into a depression because of the situation with González, and wanted to move to Orlando where her family and friends were. The memo indicates that Lee-Crespo was anxiously awaiting a final offer from the Schering office in Florida. Lee-Crespo told Burgos that "she really wanted to leave and, if an opportunity did not come up with Schering, she was going to resign anyway."

At some point, Lee-Crespo was informed that Schering would not agree to her transfer to Florida. Mercade, apparently, made that decision.

She was told that she was being reassigned from the Hato Rey territory to the Arecibo-Fajardo territory. The doctors in the new territory were mostly dermatologists. Dermatologists do not usually prescribe the medications that were the mainstays of Lee-Crespo's sales. Lee-Crespo was concerned that her commissions

would be significantly lower because she was not going to be selling medicines that dermatologists typically prescribe.

Lee-Crespo maintains that she never agreed to a change in territory and, in fact, wanted to remain in the Hato Rey territory. She says that she requested a new supervisor at the meeting but did not want a new supervisor if it meant giving up her present territory.

Pérez-Bracetti was to become Lee-Crespo's new supervisor effective April 1. In a memo to Lee-Crespo dated March 27, 2000, he outlined Lee-Crespo's work duties and then added "you will not be permitted any type of alter[c]ation and insults and/or insubordination (this includes gossiping, rumors, altercations, yelling, or negative communication toward me or any member of our Division)."

Another March 27 memo from Pérez-Bracetti to Lee-Crespo reprimanded her for failing to communicate to one of her supervisors -- either Pérez-Bracetti or González -- her inability to attend a certain convention that had taken place on March 25. The memo stated that the March 25 absence was "not the first time you have been absent from conventions and meetings," referred to Lee-Crespo's "continuous absenteeism," and listed three previous meetings from which Lee-Crespo was absent.

Effective April 1, Lee-Crespo received a 2.3 percent salary increase, which was approved by González. On March 30, a

psychiatrist issued a medical certificate diagnosing Lee-Crespo with "severe major depression" and recommending rest from that date until May 17. After March 30, Lee-Crespo never again returned to work. On April 4, Lee-Crespo was sent to Schering's doctor, who, Lee-Crespo says, suggested that she leave the company.

On April 12, 2000, Pérez-Bracetti, Lee-Crespo's new supervisor, sent a letter to Burgos requesting that the company take action against Lee-Crespo for comments that she made about him to Burgos insinuating that he had a relationship with González. Burgos had informed Pérez-Bracetti that Lee-Crespo had said "that there was something more than co-workers between" González and Pérez-Bracetti.

Burgos sent Lee-Crespo a letter dated May 1, 2000, that listed certain company documents requested from her and stated that Lee-Crespo had ignored Schering's many requests to surrender those documents. The letter also reminded Lee-Crespo that she was required either to submit certification from her doctor that she was capable of continuing to drive the company car or to surrender the car.

During April and May, Schering recovered from Lee-Crespo the product samples in her possession and also took back the company car. On May 18, Burgos called Lee-Crespo and offered her three months' salary and six months' health care coverage if she would resign. On May 19, Lee-Crespo's psychiatrist issued a second

medical certificate, this time recommending that Lee-Crespo rest for an indefinite period of time. Neither Lee-Crespo nor her psychiatrist had any idea when she would recover from depression.

On June 30, 2000, Lee-Crespo resigned. Her resignation letter stated that she was resigning because of the "voluntary and unjustified acts of [Schering's] management that have reached such a level of oppression and onerousness that they do not leave me any other alternative." Lee-Crespo claims that she never got paid for two of the months that she worked despite her requests for such payments.[4]

In June 2000, Lee-Crespo moved to Florida; she was unemployed there until April 29, 2001, when she began working as a medical sales representative for Professional Detailing, Inc.

**II.**

Review of the grant of Schering's summary judgment motion is de novo. Summary judgment should only be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

---

[4] Lee-Crespo does not argue on appeal that the refusal to make these payments was a tangible employment action, nor does she make any other claim as to the payments.

-15-

Lee-Crespo seeks to hold Schering liable primarily for allegedly harassing conduct by her supervisor, González. The Supreme Court's decision in Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), clarified the rules of employer liability for actions by a supervisor in a harassment case. If harassment by a supervisor with immediate or higher authority over an employee results in a tangible employment action against the employee, then the employer is vicariously liable; if the harassment does not result in a tangible employment action but is sufficiently severe or pervasive, then the employer is still vicariously liable but an affirmative defense is available. Id. at 754, 765. Thus, Title VII may be violated by either explicit or constructive alterations in the terms or conditions of employment. Id. at 752.

Explicit alterations -- that is, tangible employment actions -- are "significant changes in employment status," including, but not limited to, "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 761. By contrast, constructive alterations must be severe or pervasive.[5]

---

[5] In addition to meeting the "severe or pervasive" standard, a Title VII plaintiff proceeding on a constructive employment action theory must also show that the severe or pervasive harassment was because of gender or one of the other Title VII protected categories. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discriminat[ion] . . . because of . . . sex." Id. (internal quotation marks and emphasis omitted); see Rivera, 331

-16-

Id. at 752; see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002) ("A hostile work environment claim is comprised of a series of separate acts that collectively constitute one unlawful employment practice." (internal quotation marks omitted)).  Our analysis concludes that Lee-Crespo neither suffered a tangible employment action at the hands of her supervisor González nor faced sufficiently severe or pervasive harassment from her supervisor; we do not reach the issue of the affirmative defense.

A.  Tangible Employment Action

As we understand it, Lee-Crespo's case suggests three possible tangible employment actions: constructive discharge, failure to allow a transfer, and reassignment.

1.  Transfer

We start with the denial of Lee-Crespo's transfer request.  We assume arguendo that the thwarting of an employee's application to transfer could, in some circumstances, constitute a tangible employment action.  But there must be a causal link between the tangible employment action and the alleged harassment.  That is, the harassing supervisor must be the one who orders the

_____

F.3d at 189-91 (upholding summary judgment for employer where plaintiff was subjected to uninvited rude and unprofessional conduct that the court assumed to be severe and pervasive but that was not engaged in "because of" religion).  The substance of the violation is no different when the plaintiff and the harasser are of the same sex.  The motivation of the same-sex harasser must stem from sexual desire or from same-gender hostility, or both.  See Oncale, 523 U.S. at 80.

tangible employment action or, at the very least, must be otherwise substantially responsible for the action.[6]  Here, there is no proof that González ordered or adversely influenced the denial of the transfer to Florida.  To the contrary, Lee-Crespo made it clear that González wanted her to transfer: González said several times that she could not wait for Lee-Crespo to transfer.

Mercade, the general manager, had the final say whether transfer requests would be approved or denied.  There is no evidence that González contributed to the disapproval of the transfer by Mercade.  In fact, Lee-Crespo's own testimony indicates that González, along with Bursian, helped her to secure the tentative offer from the Florida office by providing her with the necessary contact information.  Lee-Crespo further testified that González and Bursian were caught off-guard when Mercade said that all transfer requests had to go through him.

2.  Reassignment

A reassignment could constitute a tangible employment action, particularly if it caused a loss of income.  But again, there must be a causal link between the tangible employment action and the alleged harassment and harasser.  Here, there is no proof that González was the one who caused Lee-Crespo to be reassigned.  To the contrary, González told Lee-Crespo and management at the

---

[6]    This case does not raise the issue of the company knowingly encouraging, endorsing, or adopting the supervisor's harassment.

March 13 meeting that Lee-Crespo was welcome to continue working for her in the Hato Rey territory.  The reassignment decision was made by Mercade, with the assistance of Burgos, the human resources representative, and Bursian, the district manager.  The decision was brought about by Lee-Crespo's request that she be given a new supervisor, and Lee-Crespo was told that having a new supervisor meant also having a new territory.  It was a reasonable response by management to separate the alleged harasser and harassee.  The contemporaneous memorandum of the March 13 meeting reflects that management understood that Lee-Crespo had "accepted the change in territory."  That Lee-Crespo now disputes that she ever agreed to the reassignment does not change the fact that there is absolutely no evidence that anyone other than non-harassers made the decision or that gender discrimination motivated the decision to move her to a new territory.

### 3. Constructive Discharge

Lee-Crespo's primary tangible employment action argument is that the harassment by her supervisor was so unbearable that she was forced to resign and was thus constructively discharged by Schering and, in turn, that such a constructive discharge is a tangible employment action.  "Constructive discharge" usually refers to "harassment so severe and oppressive that staying on the job while seeking redress -- the rule save in exceptional cases -- is 'intolerable.'"  Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 33

-19-

(1st Cir. 2003) (quoting Keeler v. Putnam Fiduciary Trust Co., 238 F.3d 5, 9-10 (1st Cir. 2001)).  In Reed, this court declined "to adopt a blanket rule" as to whether a constructive discharge constitutes a tangible employment action.[7]  Id.

To prove constructive discharge, a plaintiff must usually "show that her working conditions were so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign."  Marrero v. Goya of P.R., Inc., 304 F.3d 7, 28 (1st Cir. 2002) (internal quotation marks omitted); see Melendez-Arroyo v. Cutler-Hammer de P.R. Co., 273 F.3d 30, 36 (1st Cir. 2001).  The standard is an objective one; an employee's subjective perceptions do not govern.  Marrero, 304 F.3d at 28; Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000).  It is not enough that a plaintiff suffered "the ordinary slings and arrows that workers routinely encounter in a hard, cold world."  Suárez, 229 F.3d at 54.

Not all of plaintiff's evidence could be taken as evidence of sexual harassment.  The comments by González, a new supervisor, to the effect that plaintiff worked for her and

---

[7]    The circuits are split on this question, see Reed, 333 F.3d at 33 & n.2, and the Supreme Court has granted certiorari to resolve it, see Penn. State Police v. Suders, 72 U.S.L.W. 3105 (U.S. Dec. 1, 2003) (No. 03-95) (Mem.).
    This court held that it was clear "that the constructive discharge label [could not] be used to preclude the affirmative defense" on the facts in Reed, but left open the possibility of such preclusion "on rare facts."  Reed, 333 F.3d at 33.

plaintiff should not go around González to González's boss are hardly evidence of sexual harassment. The incidents that remain, even if taken as harassment, do not rise to the level of creating an intolerable environment.

Those incidents also did not amount to a discharge. Among other things, the evaluation of a constructive discharge claim takes into account how the employer responded to the plaintiff's complaints and whether it was likely that the harassment would continue. See Marrero, 304 F.3d at 28; see also Lindemann & Grossman, Employment Discrimination Law 657 (C.G. Weirich et al. eds., 3d ed. 2002 Supp.) ("Prompt remedial action that eliminates the allegedly intolerable working conditions operates as a complete defense to a claim of constructive discharge."). Here, once Lee-Crespo made a complaint, management moved swiftly. There was a meeting, both Lee-Crespo and González were heard, and management moved Lee-Crespo away from her nemesis. This undercuts Lee-Crespo's claim that she was forced to leave.

Lee-Crespo's argument that Schering's actions during the time of her medical leave amounted to harassment and transformed her resignation into a constructive discharge does not save her claim. Lee-Crespo was on sick leave from March 31 until June 30, the date of her resignation. There was nothing unreasonable or harassing in asking her to give back the company car and other equipment, inventory, and documents, or in scheduling her for an

appointment with the company physician. As Lee-Crespo testified, neither she nor her treating psychiatrist had any idea when she would recover or return to work. None of Schering's conduct while Lee-Crespo was on medical leave created working conditions that were so difficult or unpleasant as to force a reasonable person to resign. There was no constructive discharge.

B. Severe or Pervasive Harassment

If a supervisor's harassment did not result in a tangible employment action against an employee, then the employee must show that the harassment was so "severe or pervasive" that, in essence, it altered the terms or conditions of her employment. Ellerth, 524 U.S. at 752. The employer is then vicariously liable to the victimized employee unless the employer can successfully assert the affirmative defense outlined in Ellerth.[8] Id. at 765; Reed, 333 F.3d at 32.

All of the circumstances are examined in determining whether a work environment is sufficiently hostile or abusive,[9]

---

[8] "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 524 U.S. at 765.

[9] On appeal, Lee-Crespo argues that the district court improperly grouped the alleged incidents of harassment into categories and did not consider them as a whole in assessing Lee-Crespo's work environment. But the district court twice emphasized that it was indeed analyzing the evidence as a whole and was aware of its obligation to consider all of the alleged conduct together.

including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., 510 U.S. 17, 23 (1993); O'Rourke v. City of Providence, 235 F.3d 713, 728-29 (1st Cir. 2001). Here, the complained of conduct was episodic, but not so frequent as to become pervasive; was never severe; was never physically threatening (though occasionally discomforting or mildly humiliating); and significantly, was never, according to the record, an impediment to Lee-Crespo's work performance.

The record establishes that Mayra González was an inexperienced manager who had trouble navigating the boundary between the personal and the professional. González often displayed a disregard for professional courtesy and a penchant for inquiring about the personal affairs of other workers (both male and female). But a supervisor's unprofessional managerial approach and accompanying efforts to assert her authority are not the focus of the discrimination laws. The district court correctly concluded on this evidence that González's conduct was not so severe or pervasive that it altered the terms and conditions of Lee-Crespo's

Crespo, 231 F.Supp.2d at 429, 430. The court's categorization of incidents was useful in presenting the evidence and does not appear to have influenced detrimentally the court's analysis. In any case, we have reviewed the evidence de novo and have reached the same outcome.

-23-

employment. This case is a far cry from cases in which this court has reinstated a harassment verdict for an employee, see, e.g., O'Rourke, 235 F.3d at 738, or affirmed a jury verdict for an employee, see, e.g., Marrero, 304 F.3d at 20.

## III.

Lee-Crespo also brought pendent sexual harassment and constructive discharge claims under the comparable Puerto Rico statutes. The district court held, and Lee-Crespo concedes on appeal, that the federal and Puerto Rico laws on sexual harassment and constructive discharge are very closely aligned. We uphold the dismissal of Lee-Crespo's state law claims on the same grounds that we uphold dismissal of the federal claims.

## IV.

The district court's order granting summary judgment to Schering is **affirmed**. Costs are awarded to Schering.