Adelle RIGAU, Plaintiff,

v.

PFIZER CARIBBEAN CORPORATION, Defendants.

Civil No. 05–1141(SEC).

United States District Court, D. Puerto Rico.

Nov. 30, 2007.

Maria T. Juan–Urrutia, Escanellas & Juan, San Juan, PR, for Plaintiff.

Carl E. Schuster, Lourdes C. Hernandez–Venegas, Schuster & Aguilo LLP, San Juan, PR, for Defendants.

## OPINION AND ORDER

SALVADOR E. CASELLAS, Senior District Judge.

Before the Court is Defendant's Motion for Summary Judgment (Docket # 10) and Plaintiff's opposition thereto (Docket # 164). Defendant also moved to deem admitted its Statement of Uncontested Facts at Docket # 9 (see, Docket # 22) in view of Plaintiff's failure to comply with Local Rule 56(b). Plaintiff also opposed this motion. See, Docket # 27. After reviewing the parties' filings, the evidence in the record and the applicable law, Defendant's Motion to Deem Uncontested Defendant's Statement of Uncontested Facts (Docket # 22) and Motion for Summary Judgment (Docket # 10) are hereby **GRANTED.**

**Standard of Review**

Fed.R.Civ.P. 56(b) provides that: "A party against whom a claim ... is asserted ... may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part [of the claims asserted against him/her]." The Court may grant the movant's motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any materi-

al fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202(1986); Ramirez Rodriguez v. Boehringer Ingelheim, 425 F.3d 67, 77 (1st Cir.2005). At this stage, the court examines the record in the "light most favorable to the nonmovant," and indulges all "reasonable inferences in that party's favor." Maldonado–Denis v. Castillo–Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).

Once the movant has averred that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant to establish the existence of at least one fact in issue that is both genuine and material. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.1990) (citations omitted). "A factual issue is 'genuine' if 'it may reasonably be resolved in favor of either party' and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.' " Depoutot v. Raffaelly, 424 F.3d 112, 116 (1st Cir.2005) (quoting, Garside, 895 F.2d at 48 (1st Cir.1990)). By like token, "material" "means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." Rojas–Ithier v. Sociedad Espanola de Auxilio Mutuo, 394 F.3d 40, 42–43 (1st Cir.2005) (citations omitted). Therefore, there is a trial-worthy issue when the "evidence is such that there is a factual controversy pertaining to an issue that may affect the outcome of the litigation under the governing law, and the evidence is sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." Id. (citations omitted).

In order to defeat summary judgement, the opposing party may not rest on conclusory allegations, improbable inferences, and unsupported speculation. *See, Hadfield v. McDonough,* 407 F.3d 11, 15 (1st Cir.2005) *citing, Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990). Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a genuine issue of material fact. *Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir.1997). Once the party moving for summary judgment has established an absence of material facts in dispute, and that he or she is entitled to judgement as a matter of law, the "party opposing summary judgement must present definite, competent evidence to rebut the motion." *Mendez–Laboy v. Abbott Lab.,* 424 F.3d 35, 37 (1st Cir.2005) (*quoting, Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994)). "The nonmovant must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trialworthy issue. . . . Failure to do so allows the summary judgment engine to operate at full throttle." *Id.; see also Kelly v. United States,* 924 F.2d 355, 358 (1st Cir.1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); *Medina–Munoz,* 896 F.2d at 8, (*quoting Mack v. Great Atl. & Pac. Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989)) (holding that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve").

**Procedural and Factual Background:**

Plaintiff in this case is Adelle Rigau (hereinafter Plaintiff), a former employee of the Pfizer Caribbean Corporation, the Defendant in this case (hereinafter "Pfizer"). She alleges that she was subjected to sexual harassment at work by her colleagues and her supervisor, and that Pfizer, in turn, failed to take measures to correct this. Her complaint also avers that she was retaliated against after she notified her supervisor of the alleged sexual harassment. Plaintiff seeks relief under Title VII of the Civil Rights Act, 42 U.S.C. 2000e, *et seq.,* and several state laws.

Before entertaining Defendant's Motion for Summary Judgment, the Court needs to jump a procedural hurdle. Although Plaintiff filed an opposition to Defendant's Motion for Summary Judgment, *see,* Docket # 16, Defendant has moved to deem all the facts contained in its Statement of Uncontested Facts admitted (Docket # 22) because Plaintiff failed to comply with Local Rule 56. We agree with Defendants. Let's see.

Local Rule 56(b) provides that

"[a] party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposition shall **admit, deny or qualify** the facts **by reference to each numbered paragraph** of the moving party's statement of material facts and unless a fact is admitted shall support each denial or qualification by a record citation as required by this rule. The opposing statement may contain **in a separate section additional facts, set forth in separate numbered paragraphs** and supported by a record citation as required by subsection (e) of this rule." (Our emphasis).

Notwithstanding the clear language of the aforementioned rule, Plaintiff ran afoul of it and filed a Statement of Uncontested Facts, in which it admitted several of Defendant's proposed uncontested facts in a sentence, and then went on to state that "[t]he rest of the paragraphs, identified by

the numbers used by the defendant in its [statement], **are contested and/or additional facts are essential as follows . . .**" *See* Docket # 16–2 (**emphasis added.**) It is precisely this type of situation that Local Rule 56 is aimed at preventing. The First Circuit has stated that local rules "were developed by the district courts in this circuit in response to this court's concern that, absent such rules, summary judgment practice could too easily become a game of cat-and-mouse, giving rise to the specter of district court judges being unfairly sandbagged by unadvertised factual issues. Such rules are a distinct improvement and **parties ignore them at their peril.**" *Ruiz Rivera v. Riley,* 209 F.3d 24, 28 (1st Cir.2000)(emphasis added).

As such, "in the event that a party opposing summary judgment fails to act in accordance with the rigors that such a rule imposes, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated." *Caban Hernandez v. Philip Morris USA, Inc.,* 486 F.3d 1, 7(1st Cir.2007)(hereinafter *Philip Morris* ).

The First Circuit has made it clear that "[s]uch rules are designed to function as a means of focusing a district court's attention on what is and what is not genuinely controverted . . . to dispel the smokescreen behind which litigants with marginal or unwinnable cases often seek to hide and greatly reduce the possibility that the district court will fall victim to an ambush." *Id.*(internal citations omitted). In *Philip Morris,* the First Circuit noted that, a review of the record showed that "the district court acted justifiably in rebuffing the appellants' proffered counter-statement and crediting Phillip Morris' version of the facts. To begin, the appellants **did not admit, deny or qualify** Phillip Morris' assertions of fact **paragraph by para-**

**graph** as required by Local Rule 56 . . . Instead, they submitted an alternate statement of facts in narrative form. This failing alone would have warranted a deeming order." *Id.*

Although Plaintiff provided an enumerated statement of uncontested facts, she failed to separate her counter statement from her statement of additional facts. That is, she failed to file a counter statement denying or qualifying the facts she failed to admit and making a reference to a record citation, as required by the rule, for every fact so denied or qualified. Instead, she filed a counter statement of facts in which she mingled together facts contesting those proposed by Defendant along with additional facts. Therefore, Plaintiff's statement laid a heavy, and extra, burden on the Court's shoulders, since the Court would have to determine which of Plaintiff's proposed facts were meant to deny Defendant's facts, which were meant to merely qualify Defendant's facts, and which were additional facts proposed by Plaintiff. "Rules like Local Rule 56 are meant to ease the district court's operose task and to prevent parties from unfairly shifting the burdens of litigation to the court." *Philip Morris,* 486 F.3d at 8. This is the called anti-ferret rule, and parties ignore it at their peril. *See, Montalvo-Leon v. Wyeth Pharmaceuticals Co.,* 2007 WL 2905350, at * 7 (D.P.R.2007)(stating this rule "aims to make the parties organize the evidence rather than leaving the burden upon the district judge. Where the party opposing summary judgment fails to comply, the rule permits the district court to treat the moving party's statement of facts as uncontested.") *See also, Alsina–Ortiz v. Laboy,* 400 F.3d 77 (1st Cir.2005).

Finally, "while failure to comply with this rule does not automatically warrant the granting of summary judgment, 'it

launches the nonmovant's case down the road of an early dismissal.'" *Segarra Jimenez v. Banco Popular*, 421 F.Supp.2d 452, 455 (D.P.R.2006).

In light of the above, the Court will deem Defendant's proposed uncontested facts, which are properly supported by the record, as admitted by Plaintiff, and Plaintiff's Opposing Statement of Uncontested Facts will be disregarded by the Court.

**Uncontested Facts**

The following is Plaintiff's tale as narrated by the record.

Plaintiff started working at Pfizer on May 20, 2002, as a Professional Sales Representative under the supervision of Wilfredo López (hereinafter López). Docket # 9, ¶ 2 & 5. She was assigned to the Consumer Healthcare Division. Docket # 9, ¶ 5. Her main duty was to visit dentists and pediatricians in her assigned territory in order to market Pfizer's products. *Id.* She was assigned to the east side of Puerto Rico, from Caguas to Humacao and Aibonito. *Id.* She also attended medical conventions and other related activities. *Id.*

Plaintiff's duties were performed mainly in the field, that is, outside Company's premises. Docket # 9 ¶ 7. Her presence at Pfizer was only required for sales representatives' meetings, which were held once every 2 or 3 months. *Id.* Plaintiff was also evaluated quarterly by her supervisor, López, for her performance on the field. *Id.* at ¶ 8.

Her evaluations on the field were usually positive, and López would identify areas where Plaintiff needed improvement and would prepare action plans for her to follow. *Id.* at ¶ 9. On December, 2002, Plaintiff was evaluated for the first time and received an overall rating of "Commendable". *Id.* at ¶ 10. However, López indicated that she needed improvement in competitive knowledge, and encouraging open discussion and debate, among others. *Id.* She was satisfied with this evaluation. *Id.*

Around the same time, Plaintiff met with López to discuss her interest in pursuing a master's degree in marketing. *Id.* at ¶ 11. López recommended that she postpone her studies because she was still a newcomer in her position and was still adjusting to it. *Id.* He was worried that said studies would entail additional stress and that they might affect her performance. *Id.* Notwithstanding López's feedback, she later asked López to prepare a recommendation letter for her to submit to the University of the Sacred Heart. *Id.*

In December 2002, Plaintiff received a voice mail from an unidentified man who referred to her as "baby" and said that he missed her a lot and wanted desperately to see her. *Id.*, at ¶ 12. She did not complain about this incident with anyone from Pfizer at that time. *Id.* On January, 2003, during a cycle meeting, she realized that the call was made by David Ojeda (hereinafter referred to as Ojeda), a merchandiser. *Id.* Ojeda approached her and she told him to stop his behavior. *Id.* It was after this incident that Plaintiff complained about it to her supervisor, López. *Id.* Plaintiff admits that after this incident Ojeda never called her or approached her again. *Id.*

In March 2003, López evaluated Plaintiff again for her performance on the field. In the evaluation forms (called Coaching Forms), López indicated that Plaintiff met expectations in several areas, but that she still needed to improve others; among them, to increase her passion for learning, to improve her technical expertise, her competitive knowledge and her listening skills, to further develop her sales territory, and to be more productive. *Id.*

Sometime around July, 2003, Plaintiff became aware that López had made some negative remarks about her in the letter of recommendation he confidentially sent to the Sacred Heart University. *Id.* at ¶ 15. She became upset with the contents of the letter because it described her as slow and someone who did not listen. *Id.* As a result, Plaintiff requested a meeting with López, which took place on July 8, 2003. *Id* at ¶ 16. At that time she informed López that she had read the recommendation letter and, for the first time, she told him that she felt harassed and that she felt uncomfortable with her group of coworkers, and she mentioned the incident with Ojeda. *Id.*

The next day, López met with Millie García, Pfizer's Human Resources Director (hereinafter García), to inform her of his meeting with Plaintiff. *Id.* at ¶ 17. The same day, García arranged a meeting with Plaintiff. *Id.*

In the meantime, on July 11, 2003, Plaintiff sent a letter to García whereby she complained of sexual harassment. *Id.*, at ¶ 18. However, the letter did not specify the events of which Plaintiff complained. *Id.* The letter only mentioned the incident with López and his negative reaction to her complaint of sexual harassment. *Id.* On July 14, 2003, after Plaintiff postponed it twice, she met with García to discuss her concern about sexual harassment. *Id.* She told her about the incident with Ojeda and, for the first time, alerted management of the following incidents:

(1) that on one occasion one of her co-workers (Osvaldo Rivera or Miguel Cubero) made a comment wondering what she did to doctors that enabled her to meet her sales quota;

(2) that during a dermatologists convention on June 20, 2003, in the presence of López, Osvaldo Rivera (Rivera) told her

that they wanted to know whether she had already had sex with her boyfriend;

(3) that Rivera twice commented in public that she was fat and that she should refrain from eating certain foods;

(4) that during a dental convention she saw Rivera flirting with an unknown woman and grabbing her buttocks;

(5) that López wrote a negative recommendation letter about her and sent it to the Sacred Heart University, where Plaintiff was applying for a Masters Degree;

(6) that she was not assigned to the territory of her preference during the reorganization made early on 2003;

(7) that during a field trip López told her that he had not yet approved an order she made for samples, but immediately told her that he would approve it;

(8) that on one occasion López told her that she had tolerated a lot and she was very brave, that work was not "Disney World" and that he warned her that she was going to work with men; and

(9) that during a company trip to Cancún, a co-worker got drunk and tried to get too close to her;

After this meeting, García informed Plaintiff that she would conduct an investigation into her allegations. Docket # 9, ¶ 21. She interviewed all the members of the Consumer Health Division, where Plaintiff worked and took notes of said interviews. *Id.* García found no violation of Pfizer's sexual harassment policy. *Id.* However, as a precautionary measure, within 10 days after she met with Plaintiff, García sent written warnings to López and Rivera regarding the comments Plaintiff alleged they said to her. *Id.*

After the investigation conducted by García, Plaintiff's co-workers, specifically Osvaldo Rivera and Miguel Cubero, did not speak to her unless it was about work-

related matters. *Id.* After these events, Plaintiff was away from work on seek leave from July 18, 2003 until August 4, 2003. *Id.* at ¶ 24.

Upon her return to work, on August 5, 2004, García met with Plaintiff to discuss the results of her investigation. *Id.* García also sent a letter to Plaintiff, dated August 12, 2004, whereby she explained the results of her investigation and invited Plaintiff to let her know immediately if there was anything else that might trouble her in the future. *Id.* The letter also informed Plaintiff that the investigation revealed that, during a convention, she had allowed a male companion to spend the night in the hotel room, paid by Pfizer, without complying with Pfizer's policy in this regard. *Id.*

After the investigation conducted by García, Plaintiff admitted, the incidents she perceived as harassment, except those related to her weight, never recurred. *Id.* at ¶ 26. However, after the investigation some incidents took place in which Plaintiff ground her retaliation claims:

(1) Plaintiff was led to believe by Nimsy Díaz, from Pfizer's Human Resources Department, that October 10, 2003 was a workday, it being a holiday. However, upon Plaintiff informing López of the incident, he stated that he would count that day as a "visit" day. Docket # 9 ¶ 27.

(2) On November 25, 2003, during a meeting, López addressed Plaintiff as "Adelita", and then went on to say, "I'm sorry, Adelle. In case you might feel that is sexual harassment." Docket # 9, ¶ 28.

(3) On December, 2003, during a trip to Jarabacoba, all employees were required to be dressed in safari clothes, but Plaintiff did not because the clothes did not fit her right, and because she did not know that the safari outfit was mandatory. As a result, she felt ridiculous. Docket # 9 ¶ 29.

(4) After suffering an accident, Plaintiff called the Fleet Supervisor directly to inform of the situation, and López warned her that she was not following the proper channels. Docket # 9, ¶ 30;

(5) On March 11, 2004, López evaluated Plaintiff's performance for 2003, and rated her overall performance as "Commendable"; however, in the Leader Behavior part, she received an overall rating of "Need Improvement". She received, yet again, a "Need Improvement" rating in the area of encouraging open discussion, among others. After discussing some points with Plaintiff, López modified one of the areas and improved her rating from "Needs Improvement" to "Commendable". Still, her overall evaluation rendered a "Needs Improvement" rating. Docket # 9 ¶ 31. A review of the evaluation also reveals that López praised Plaintiff, in numerous occasions, for her selling and persuasive skills. *See,* Exhibit # 14, at pp. 4 & 7. However, he advised Plaintiff, as he had in previous evaluations, that she needed to improve her listening skills and show more passion for learning. *Id,* at p. 3.

(6) Plaintiff was dissatisfied with her evaluation. However, Pfizer took no disciplinary measure against Plaintiff as a result of her evaluation. To the contrary, after the evaluation, Plaintiff received a salary increase. On the same day of her evaluation she took a sick leave and never returned to work. Docket # 9 ¶ 33

(7) After she left work, Plaintiff called Pfizer's Human Resources hot line and a representative asked if she was the person who had called to ask whether it was legal for the company to take away her car, whether she had been denied long term disability an whether she had requested Social Security benefits. Docket # 9 ¶ 35.

(8) Finally, after she left work Plaintiff received several excess payments which

she reported to Pfizer. Pfizer made no effort to recover said excess payments and took no action against her. Docket # 9, ¶ 36.

Last, but not least, at all times Pfizer had a policy in place against sexual harassment, and a "Open Doors" policy, of which Plaintiff was informed at the time she was hired. Docket # 9 ¶¶ 2 & 4.

**Applicable Law and Analysis**

i. *Sexual Harassment*

Defendant argues that Plaintiff's Title VII claim for sexual harassment are without merit because she has failed to show either that the conduct she allege to constitute sexual harassment is so pervasive as to alter the conditions of her employment, and that, in the alternative, the evidence shows that there is no room for employer liability.

■ We begin with bedrock. Title VII of the Civil Rights Act, "makes it an unlawful employment practice to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." *See,* 42 U.S.C. § 2000e–2(a)(1); *see also, Harris v. Forklift,* 510 U.S. 17, 20, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The United States Supreme Court has broadly interpreted the phrase terms, conditions or privileges of employment, stating that it encompasses Congress' intent to "strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris,* 510 U.S. at 20, 114 S.Ct. 367. In order to succeed in a hostile work environment claim, Plaintiff must show that: (1) she is a member of a protected class (in this case, her gender); (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive; and (6) some basis of employer liability. *Rivera–Martinez v. Commonwealth of Puerto Rico,* —— Fed.Appx. ——, 2007 WL 16069 (1st Cir.2007), *citing, O'Rourke v. City of Providence,* 235 F.3d 713, 728 (1st Cir.2001); *see also, Crowley v. L.L. Bean, Inc.,* 303 F.3d 387, 394 (1st Cir. 2002).

"The focus of hostile work environment cases is generally on elements (4) and (5)", that is, the work environment must be severely abusive, subjectively and objectively. *Rivera–Martinez,* —— Fed.Appx. at ——, 2007 WL 16069 at p. 2. Title VII is violated whenever "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris,* 510 U.S. at 20, 114 S.Ct. 367. (Citations omitted). In other words, "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Id.* Despite Title VII's protection against discrimination based on sex, the Supreme Court has clearly stated that "the prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the conditions of the victim's employment." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)(hereinafter *Oncale* ). That is, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview." *Id.*

■ Although there is no mathematically precise test, in order to determine whether an environment is hostile or abusive, the Court must look at all the circumstances, which may include: (1) the frequency of the discriminatory conduct, (2) its severity, (3) whether it is physically threatening or humiliating, (4) whether it was just a mere utterance, and (5) whether it unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *see also, Marrero v. Goya of Puerto Rico*, 304 F.3d 7, 18–19(1st Cir.2002)(hereinafter *Goya* ); *Lee–Crespo v. Schering–Plough Del Caribe, Inc.*, 354 F.3d 34, 46 (1st Cir.2003)(hereinafter *Lee–Crespo* ); *Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 83 (1st Cir.2006)(hereinafter *Pomales* ). Although this inquiry is fact-specific, and, as such, reserved for a fact-finder, "summary judgment is an appropriate vehicle for policing the baseline for hostile environment claims." *Pomales*, 447 F.3d at 83.

■ Harassing conduct, prohibited by Title VII, can constitute unwelcome conduct motivated by sexual desire, or differential treatment towards an employee because of her sex. *Rivera–Martinez*, —— Fed.Appx. at ——, 2007 WL 16069 at p. 3. To prove the second type of harassing conduct, a plaintiff must prove that "members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* The record is totally devoid of evidence to support the proposition that male employees were treated better than female employees. Therefore, our focus is on whether the actions and comments to which Plaintiff was exposed can be said to have been, subjectively and objectively, severe and abusive. We conclude that they were not. Let's see.

■ Plaintiff's sexual harassment claim stands on a series of scattered incidents or comments, mostly involving her co-workers. These can be summed up as followed: Osvaldo Rivera, one of Plaintiff's co-workers made a series of offensive comments asking details of her personal sex life, wondering how she met her sales quota, and implying that she should diet because she was fat. This same employee also flirted with an unknown woman in a convention while touching her *derrière*, which Plaintiff witnessed.

■ Although we note that Rivera's conduct was definitely non gallant and discourteous, discourteousness alone cannot be the basis of a hostile work environment claim under Title VII. Rivera's comments are the type of "simple teasing, offhand comments, and isolated incidents [that] do not amount to a hostile work environment[, except when extremely serious]." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *see also, Lee–Crespo*, 354 F.3d at 38–39 (a supervisor's prying questions about plaintiff's personal life, comments about her appearance, and questions of whether she ever dated doctors, not enough to constitute sexual harassment). This standard attempts to ensure that Title VII does not become a general civility code. *Id.* When followed correctly, it "will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* Viewed objectively, Rivera's comments and actions cannot be said to create an abusive and hostile work environment, but ordinary tribulations of the workplace. Although the incident that took place during the dental convention (*i.e.* Rivera touching another woman's buttocks) is of a more serious nature, the record is devoid of any evidence that such a woman was a co-worker and that Rivera's behavior was unwelcome. Moreover, Rivera's conduct was not ad-

dressed to Plaintiff, and, even if she subjectively felt harassed, she fails to pass the objectively offensive standard of Title VII. The fact that Plaintiff believed that said touching was inappropriate in public does not give rise to a Title VII claim.

■ At this point, the Court needs to emphasize the importance of the United States Supreme Court's warning that Title VII is not a general civility code, and that requires "neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the conditions of the victim's employment." *Oncale*, 523 U.S. at 81, 118 S.Ct. 998. Congress did not intend to deprive the workplace of conduct so characteristic of human nature as flattery (although non gallant), and occasional subtle indiscretion, which employees sometimes use to encourage camaraderie on the job and ease its usual downs. Plaintiffs, and, specially, Counsel, should attempt to assess the facts in an objective manner prior to filing sexual harassment claims. The words of Judge Bownes illustrate this concern

> A male supervisor might believe, for example, that it is legitimate for him to tell a female subordinate that she has a great figure or nice legs. The female subordinate, however, may find such comments offensive. Such a situation presents a dilemma for both the man and the woman; the man may not realize that his comments are offensive, and the woman may be fearful of criticizing her supervisor. We think, however, that both parties must make an effort to overcome this dilemma.

*Lipsett v. University of Puerto Rico*, 864 F.2d 881, 898 (1st Cir.1988). Should employees file a complaint for every sexually charged joke or indiscreet question, regardless of its severity, this Court may eventually become a court of manners, and not of law.

■ There is also reference in the record to an incident where Plaintiff received a voice mail from an unidentified man, who later turned out to be David Ojeda, Plaintiff's co-worker, where he called Plaintiff "baby" and said that he missed her a lot and wanted to see her. However, after Plaintiff complained about it to her supervisor, and she confronted Ojeda at a convention, Ojeda never called or approached her again. As such, this was an isolated incident that lacks the severity required by Title VII. The same goes for the incident where an unidentified co-worker got drunk and tried to get too close to Plaintiff. *See, Rivera–Martinez*, —— Fed.Appx. at ——, 2007 WL 16069 at p. 3 (stating that two isolated incidents where the plaintiff's supervisor inappropriately caressed her arm, and was pushed out of the office by his supervisor using his hip, while grabbing her back in the brassiere area were insufficient to support a sexual harassment claim).

The remaining incidents (López's negative recommendation letter, her not being assigned to the territory of her preference, some misunderstanding regarding an order for samples, and López's comment that she was not in Disney World), perceived by Plaintiff as sexual harassment, cannot be framed as such either. These are mere annoyances of the work that, absent proof of preferential treatment to male employees, are not protected by Title VII. López's Disney World comment, although harsh, does not satisfy Title VII rigid standard; "a supervisor's unprofessional managerial approach, and accompanying efforts to assert her authority are not the focus of the discrimination laws." *Lee–Crespo*, 354 F.3d at 46–47. As stated above, Title VII is not a general civility code, and conduct "must be extreme to be actionable." *Rivera–Martinez*, —— Fed.Appx. at ——, 2007 WL 16069 at p. 3.

■ Notwithstanding the above, even if we conclude that the evidence suffices to make out a *prima facie* case of sexual harassment, Plaintiff's Title VII claim must founder because there is no evidence of employer liability, the sixth element of this claim. A Title VII faces different standards of employer liability "depending on whether the harasser is a supervisor or co-employee of the victim." *Crowley,* 303 F.3d at 401. When the harasser is a co-worker, the plaintiff must prove that "the employer knew, or should have known of the charged sexual harassment and failed to implement prompt and appropriate action." *Id.* If, however, the alleged harasser is the plaintiff's supervisor, the employer is vicariously liable, subject to an affirmative defense: that the employer exercised reasonable care to prevent and correct promptly the harassment and the "employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Noviello v. City of Boston,* 398 F.3d 76, 94–95 (1st Cir. 2005).

■ The majority of the incidents perceived by Plaintiff as sexual harassment stemmed from her co-workers (comments regarding her personal life, her appearance and undesired approaches). There is no evidence in the record that Pfizer knew or should have known of these incidents prior to July 8, 2003 [1] (date when Plaintiff met with López to discuss the recommendation letter and she told him that she felt harassed), that Plaintiff could have been subjected to sexual harassment.[2] Therefore, our review focuses on whether Pfizer took proper measures to correct this conduct promptly after said date. We conclude that it did.

On July 9, 2003, that is, a day after Plaintiff told López that she felt harassed, he met with García (HR Director) to inform her of Plaintiff's contentions. The same day, García arranged a meeting with Plaintiff, which was twice postponed by Plaintiff. After Plaintiff's re-scheduling, the meeting took place on July 14, 2003 and Plaintiff gave García a detailed account of the incidents. *See,* Docket # 9 ¶¶ 17–19. García assured Plaintiff that an investigation would be made on her allegations. Shortly after said meeting, García interviewed all the members of Plaintiff's Division (the Consumer Health Division), took notes of the interview, and concluded that there had been no violation of Pfizer's anti-sexual harassment policy. However, within 10 days after the meeting, García sent Rivera and López written warnings regarding the comments made by them to Plaintiff. On July 18, 2003, Plaintiff took sick leave and returned to work on August 4, 2003. On August 5, García met with Plaintiff to discuss her findings and invited her to let her know immediately if she encountered any further problems with other employees. After said investigation was performed, Plaintiff was not subjected to further conduct that she perceived as sexual harassment, except to some comments on her weight.

---

**1.** Although Plaintiff told López, on January 2003, about the voice mail she received where a co-worker (Ojeda) called her baby, she also explained that he had apologized and that he never approached her again. This is apparent from the letter she sent to García on July 11, 2007, complaining of sexual harassment in the job, where she made no mention of the incident with Ojeda.

**2.** It is difficult to conclude that Pfizer should have known of these events prior to Plaintiff's July 8th notice, since it is undisputed that Plaintiff only visited Pfizer once every two or three months. *See,* Docket # 9 ¶ 7.

█ We believe that the steps taken by Pfizer were reasonable under the circumstances, and, through Plaintiff's own admission in her deposition, were effective, insofar as she no longer felt sexually harassed. This is enough to conclude that Pfizer is not liable for the sexual harassment caused by Plaintiff's co-workers. However, the inquiry pertinent to López is a bit more intricate. Although Pfizer could be held vicariously liable for López's harassing conduct,[3] it may present evidence to support an affirmative defense of reasonable care. *See, Noviello*, 398 F.3d at 94–95. Pfizer would have to prove that it exercised reasonable care to prevent and correct the harassment and that Plaintiff failed to take advantage of the preventive or corrective opportunities provided by Pfizer. *Id.* We find that Pfizer has met this burden. The record shows that it has a written policy against sexual harassment[4], as well as a Doors Open policy[5], which were notified to Plaintiff upon her arrival at Pfizer. Furthermore, the record also shows that Plaintiff failed to take advantage of the open doors policy and, to the contrary, it waited almost six months to report the series of incidents described above. Last, but not least, after Plaintiff complained about López's conduct, Pfizer conducted an investigation and sent a written warning to López. In other words, the evidence on record is sufficient to support

an affirmative defense of reasonable care on Pfizer's part. As such, we conclude that Plaintiff failed to present evidence to sustain a *prima facie* case of sexual harassment against Pfizer. She failed to prove that she was subjected to conduct sufficiently severe and abusive so as to constitute hostile work environment based on sex. She also failed to show that Pfizer could be held accountable for any of the conduct she described as harassment. Therefore, her claim for sexual harassment under Title VII is hereby **DISMISSED with prejudice.**

ii. *Retaliation*

█ On the other hand, Title VII's prohibition also encompasses retaliatory conduct moved by an employee engaging in protected activity. In order to make a *prima facie* case of retaliation under Title VII, a plaintiff must show that: "(1) she engaged in protected conduct under Title VII; (2) she suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity." *Goya*, 304 F.3d at 22. Adverse employment actions may include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Id.* at 23. Because Pfizer does not contest the first element, we will presume that Plain-

3. We already concluded that López's actions did not constitute sexual harassment. However, for the sake of the liability argument we assume they were.

4. This policy states, among other things, that "Sexual harassment in the workplace is understood as any kind of unwelcome sexual approach, unwelcome requirement for sexual favors and any other kind of unwelcome conduct, verbal or physical of sexual nature. It is the responsibility of management and supervision personnel not to incur in sexual harassment, nor create a hostile environment in the workplace ... All notices, complaints or

claims that are received about sexual harassment will be investigated promptly." *See,* Docket # 13, Exh. 2.

5. This policy, in turn, provides that "Pfizer adopted an Open Door Policy inviting the personnel to bring their doubts, ideas and suggestions to someone who is in the position of attending them. We want to remind you that the doors of all managers are open to discuss any matter that you may want to bring up about Pfizer, your job or your relationship with your supervisors and co-workers ... including, but not limited to, discrimination, harassment or unequal treatment."

tiff did engage in protected conduct. As such, we will discuss the second and third elements.

■ For the retaliatory conduct to be actionable, a Title VII plaintiff must show that "a reasonable employee would have found the challenged action materially adverse ... [that is], it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Carmona–Rivera v. Commonwealth of Puerto Rico,* 464 F.3d 14, 20 (1st Cir.2006). In other words, "the alleged retaliatory action must be material, producing a significant, not trivial, harm ... trivial actions such as petty slights, minor annoyances, and simple lack of good manners, will not normally create such deterrence." *Id.*

■ Although retaliation may be found when the employer tolerates harassment by other employees, "a plaintiff must show that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment." *Noviello,* 398 F.3d at 92. That is, the retaliatory harassment must meet the same standards explained in the prior section. However, retaliatory harassment "requires a more nuanced analysis[, because] the very act of filing a charge against a coworker will invariably cause tension and result in a less agreeable workplace." *Id.* at 93. As Senior Judge Selya puts it

> The target of the complaint likely will have coworker-friends who come to his defense, while other coworkers will seek to steer clear of trouble by avoiding both the complainant and the target. Although admittedly a source of unpleasantness in the workplace, such behavior should not be seen as contributing to a retaliatory hostile work environment. After all, there is nothing inherently wrong either with supporting a friend or with striving to avoid controversy. We

think it follows that those actions that are hurtful to a complainant only because coworkers do not take her side in a work-related dispute may not be considered as contributing to a retaliatory hostile work environment.

■ Plaintiff's allegations of retaliation, as they stem from her coworkers not talking to her save for work-related matters, are of this very nature. This is specially true of those employees who were the targets of her complaint, that is, Rivera and López, as well as their coworkers-friends. Plaintiff is not entitled to a Title VII retaliation claim merely because her coworkers did not take her side.

■ The remaining alleged retaliatory acts are of different nature, although equally defective. "An allegedly retaliatory act must rise to some level of substantiality before it can be actionable." *Id.* at 92 The rationale behind the substantiality requirement is that if protected activity "leads only to commonplace indignities typical of the workplace (such as tepid jokes, teasing, or aloofness), a reasonable person would not be deterred from engaging in protected conduct. After all, an employee reasonably can expect to encounter such tribulations even if she eschews any involvement in protected activity." *Noviello,* 398 F.3d at 92. The majority of the incidents, taken by Plaintiff as retaliatory, can be catalogued as minor annoyances that employees are expected to encounter in any job: (1) a misunderstanding on whether a particular day was a holiday or a work-day, which did not affect Plaintiff in any manner; (2) Plaintiff feeling ridiculous because she did not wear a particular outfit in a work-related trip, because, although it was provided to her, she was not told it was mandatory; (3) López warning her that she was not following Pfizer's proper channels in reporting an

accident with her car; (4) receiving excess payments in her check after leaving work, which Pfizer did not attempt to collect from her. We conclude that neither of these events, even if taken together, can constitute a retaliatory adverse employment action. They lack the level of substantiality required by Title VII. In other words, a reasonable person would not be deterred from engaging in protected activity to avoid these minor discomforts.

Plaintiff also premises her retaliation claim on an incident where López called her Adelita (little Adelle) and then apologized to her in the event she found that to be sexual harassment. Although undesirable, we cannot say that this act is sufficiently severe or substantial to meet Title VII's standard. It can be better described as a tepid joke or aloofness, against which Title VII does not protect. In sum, we find that neither of these events are substantial enough to constitute an adverse employment action.

■ On the other hand, Plaintiff's allegations that López gave her a negative job evaluation in retaliation for her sexual harassment complaint, may be deemed substantial enough to constitute a retaliatory act; adverse employment actions may include "demotions, disadvantageous transfers or assignments, refusals to promote, **unwarranted negative job evaluations,** and toleration of harassment by other employees." *Goya*, 304 F.3d at 22 (emphasis added). However, Title VII does not shield an employee who has engaged in protected conduct from receiving negative evaluations. What Title VII forbids is an employer giving an **unwarranted** negative evaluation due to retaliatory animus. The record is devoid of evidence to sustain that Plaintiff's March 11, 2004 evaluation was

unwarranted. Furthermore, the record does show that some of the areas where Plaintiff received negative feedback had already been identified by her supervisor as weaknesses in earlier evaluations (i.e. the December 2002 evaluation and March 2003). Moreover, although the evaluation rendered an overall rating of needs improvement, Plaintiff was praised in areas as important as selling and persuasive skills. These facts preclude a finding that Plaintiff's negative evaluation was uncalled for and, as such, a retaliatory act. We also find that Plaintiff has not met the third element: that the adverse action was causally connected to the protected conduct. That is, the record does not support the contention that the negative evaluation was caused by her filing a complaint.[6]

■ Furthermore, "the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment." *Goya*, 304 F.3d at 23. In order to prove that an employment action is adverse within the meaning of Title VII, a plaintiff must show that the employer "took something of consequence from her, say by, reducing her salary, divesting her of significant responsibilities, or that it withheld from her an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for a promotion after a particular period of service." *Goya*, 304 F.3d at 25. Pfizer took no adverse action against Plaintiff following her evaluation. To the contrary, after discussing some points with her supervisor, one of the ratings within the evaluation was improved, and her salary was increased. As a matter of fact, on the same day of her evalua-

---

**6.** We must also note that the evaluation on point was made on March 2004, that is, nine months after Plaintiff made the complaint to management. An extended lapse between the protected conduct and the alleged retaliatory act operates against Plaintiff.

tion, Plaintiff took a sick leave and never returned to work.

We conclude that Plaintiff has failed to make out a *prima facie* case of retaliation under Title VII. She proved no adverse employment action taken on Pfizer's part following her sexual harassment complaint. This dooms her retaliation claim. As such, Plaintiff's Title VII retaliation claim is hereby **DISMISSED with prejudice.**

### iii. *State-law claims*

■ The remainder of Plaintiff's claims are grounded on Puerto Rico law. Exercising jurisdiction over pendent state law claims once the federal law claims are dismissed is discretional. *See, Newman v. Burgin*, 930 F.2d 955, 963–964 (1st Cir. 1991) (holding that the power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one substantial federal claim in the lawsuit ... [and] the district court has considerable authority whether or not to exercise this power, in light of such considerations as judicial economy, convenience, fairness to litigants, and comity). Because we have dismissed the federal law claims, we will not exercise supplemental jurisdiction over the state law claims. Therefore, Plaintiff's claims arising from Puerto Rico law are **DISMISSED without prejudice.**

**SO ORDERED.**