Ruth ROSARIO, Plaintiff,

v.

**DEPARTMENT OF the ARMY, et al., Defendants.**

**Civil No. 06–1090 (FAB).**

United States District Court, D. Puerto Rico.

Aug. 8, 2008.

---

Vladimir Mihailovich–Nikolich, Carolina, PR, for Plaintiff.

Ginette L. Milanes, Rebecca Vargas–Vera, United States Attorneys Office, District of Puerto Rico, San Juan, PR, for Defendants.

## OPINION AND ORDER

FRANCISCO A. BESOSA, District Judge.

On January 24, 2006, Ms. Ruth Rosario Suarez filed this complaint against the Department of the Army ("DOA"), Ivan Arroyo, LTC Kyle D. Campbell, and Dr. Francis J. Harvey, Secretary of the Army, claiming sexual harassment under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*[1] On May 14, 2008, defendants filed a Motion for Summary Judgment alleging, in general, that Rosario's sexual harassment claims fail as a matter of law. (Docket No. 34) On July 15, 2008, plaintiff opposed defendants' request. (Docket No. 41) For the reasons discussed below, the Court **GRANTS** defendants' request and **DISMISSES** the complaint.

## I. *Factual Background*

Ms. Rosario began her employment with the DOA as a civilian employee in August, 1988. In February, 2001, Ms. Rosario was transferred to Puerto Rico and worked as a Medical Records Technician with the Patient Administration Medical Records Section, Rodriguez Army Health Clinic in Fort Buchanan, Puerto Rico. (Defendants' Statement of Facts "DSF", ¶ 1; Plaintiff's Response in Opposition "PRO", ¶ 1)

Mr. Arroyo trained Ms. Rosario when she started her employment at Rodriguez Army Health Clinic. At the time, however, he was not Ms. Rosario's supervisor, but her co-worker. (DSF, ¶ 2; PRO, ¶ 2)

Plaintiff and Mr. Arroyo worked in close proximity to one another and sometimes rotated the use of the front desk. (DSF, ¶ 3; PRO, ¶ 3)

In April, 2001, Ms. Saldine Strassner (female) was hired as the supervisor of plaintiff's unit. At this time, SPC Lora (male), SPC Pullin (male), and PVT Carter (female) also worked in Plaintiff's area and had contact with Mr. Arroyo. (DSF, ¶ 6; PRO, ¶ 6) Ms. Strassner was plaintiff's friend.

Mr. Arroyo did not get along with any of these individuals, called them derogatory names and threw their personal items away. (DSF, ¶ 7; PRO, ¶ 7)

In or around May, 2002, the supervisor position in the medical records section became available. Plaintiff admits that Mr. Arroyo criticized SPC Lara (male) to his superior officers because Mr. Arroyo wanted the position. (DSF, ¶ 12; PRO, ¶ 12)

In or around June of 2002, Mr. Arroyo was selected to be the supervisor of the medical records section (Medical Records Supervisor). Plaintiff then worked under his immediate supervision. (DSF, ¶ 13; PRO, ¶ 13) During the same month, SGT Sara Rutherford was sent to the medical records section to train Mr. Arroyo. Mr.

---

1. Although plaintiff originally included a claim for alleged hostile work environment because of her national origin, she later conceded that "she does not have enough evidence to prove the national origin discrimination charge." (Docket No. 42, p. 10) Accordingly, the factual narrative will be limited to the remaining claim.

Arroyo, however, did not get along with her and recommended that his training be cut short because she was not useful to the section. (DSF, ¶ 14; PRO, ¶ 14) Plaintiff alleges that soon thereafter, Mr. Arroyo started harassing her.

On or about August 13, 2002, Mr. Arroyo gave plaintiff a Memorandum stating that her initial counseling session was scheduled for August 28, 2002. One of the items listed for discussion was "dress code". (DSF, ¶ 15; PRO, ¶ 15)

On April 8, 2003, Plaintiff received an overall "successful" rating from Mr. Arroyo. Plaintiff had received overall "excellent" rating from her previous supervisors. Plaintiff disputed Arroyo's evaluation but it was not changed. (DSF, ¶ 17; PRO, ¶ 17)

In the same performance period (4/1/2002 to 3/31/2003), two (2) other employees (one male an one female) under Mr. Arroyo's supervision received top block, "Excellent", ratings. (DSF, ¶ 18; PRO, ¶ 18)

In April, 2002, Mr. Arroyo complained to LTC Campbell that plaintiff's dress/attire, as well as her food and personal items on the front desk were presenting an unprofessional environment. LTC Campbell advised Mr. Arroyo to counsel plaintiff and take the appropriate corrective measures. Mr. Arroyo threw away Plaintiff's food, and removed her pictures, purse, bills and other personal things from the front desk. (DSF, ¶ 19; PRO, ¶ 19)

Plaintiff further alleges that Mr. Arroyo downloaded sexually oriented jokes from the computer and commented on them loudly, mostly when she was present; told "everyone" around the office that Plaintiff was dressing like a street woman; said that Plaintiff looked disgusting, that she was fat and had delinquent kids; that he always felt uncomfortable with the way plaintiff dressed and that he was constantly addressing the "dress code". In various instances, "he would bring other people[2] to [within] 5 feet [of] plaintiff" and expressed "... look at her, how is she dressed, how those pants are so high. Look at those panties. And you can even see the ..." (Docket No. 42)

Mr. Arroyo testified that, after a meeting in March or April, 2002, with Plaintiff and Mr. Maldonado (Mr. Arroyo's supervisor), Plaintiff showed up "professionally" every single day and that the way she was dressing had improved 300%. (PRO, ¶ 19; Exh. 1, pp. 226–227[3])

On October 2, 2003, plaintiff was given a memorandum from Daniel Rodriguez (Telephone Triage Nurse) regarding the Initial Counseling Period for September 1, 2003 to August 31, 2004. The memo refers to "dress code" for civilians while on duty and reminds plaintiff that "a professional businesslike [sic] image is expected for the

---

**2.** Although plaintiff here refers to "other people", she supports this statement with the deposition of Mr. Hernandez (one of Mr. Arroyo's friends) who testified the following: "... it was in several times that Mr. Arroyo talked to me about how uncomfortable he was feeling about how she was dressing and how she worked the times that she was taking the stuff there in the—in the front section, you know." In front of the—the—the fire line, basically, because that's where the whole division goes through there. [...] "... tell me about her underwear and especially her pant-

ies, you know, because they were very noticeable. And he was just so uncomfortable and how disgusting he feels about it. Right behind her back he was doing that, about 5 ft. from her." (Docket No. 42, pp. 288–289)

**3.** According to Mr. Maldonado's testimony, it was Mr. Arroyo who approached him because he was having "problems" with Ms. Rosario (because of the way plaintiff behaved towards the patients and the way she dressed) and asked him to be the mediator. (Docket No. 42, Exh. 1, p. 350)

public in general." (DSF, ¶ 22; PRO, ¶ 22)

Plaintiff alleges that her working conditions were affected because of Mr. Arroyo's conduct. She specifically asserts that she was constantly scared of Mr. Arroyo, became depressed, cried all the time, was afraid to speak to anyone at the workplace, did not want to go to work, and was hospitalized after suffering a nervous breakdown. (Docket Nos. 2 and 42; *see also*, Docket No. 41, Plaintiff's Statement of Additional Facts ("PSAF"), ¶¶ 4–6, 11 and 18)

Mr. Maldonado did not consider the way Plaintiff dressed inappropriate. (PSAF, ¶ 23)

Mr. Maldonado was asked whether he had observed Mr. Arroyo treating any male employees like he treated Ms. Rosario and he answered the following:

Yes, he did. I remember one named Pullin. His name was Pullin. The way he was treating him. He was treating him like he was a dumb, like—like he was—'Look at these—these kind of soldiers we get in this Army', those kinds of statements like that, you know.

He tried to put down everybody—everybody on that section just to make him look good, you know. Basically, that's—that was my perception after I realized that he does have a problem. He does have a personal problem, and needs help basically.

I think he needs help from a psychology or psychiatrist that could help that man out. Because, I don't think it's normal of a supervisor to do that to anyone in the section and put them in the environment that they were having. (Docket No.42, Exh. 1, pp. 293–294)

Mrs. Olga Cournier understands that Plaintiff was not dressed inappropriately for work. (PASF, ¶ 13)

Mr. Maldonado brought the issue of the hostile work environment to the "chain of command", but they did not do anything about it. (PASF, ¶ 22)

On July 3, 2004, the Army's EEOC Investigator conducted an evidentiary hearing on Plaintiff's EEOC complaint. On November 5, 2005, the agency found for the Army. This complaint followed.

## II. *Summary Judgment Standard*

The court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *See also Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52. (1st Cir.2000).

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." See Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once a properly supported motion has been presented before the court, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the court's denial of the motion for summary judgment. For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the exis-

tence of an authentic dispute. *See Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49 (1st Cir. 2000).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine". "Material" means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is "genuine" when a reasonable jury could return a verdict for the nonmoving party based on the evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505. It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion." *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994).

In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

### A. Title VII Claims

Title VII of the Civil Rights Act, "makes it an unlawful employment practice to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1); *see also, Harris v. Forklift,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Rigau v. Pfizer Caribbean Corp.,* 525 F.Supp.2d 272, 282 (D.P.R.

2007). The United States Supreme Court has broadly interpreted the phrase "terms, conditions or privileges of employment," stating that it encompasses Congress' intent to "strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris,* 510 U.S. at 20, 114 S.Ct. 367.

In order to succeed in a hostile work environment claim, plaintiff must show that: (1) she is a member of a protected class (in this case, her gender); (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive; and (6) some basis of employer liability. *Pomales v. Celulares Telefonica,* 447 F.3d 79, 83 (1st Cir.2006); *see also Rigau,* 525 F.Supp.2d at 282 (*citing O'Rourke v. City of Providence,* 235 F.3d 713, 728 (1st Cir. 2001) and *Crowley v. L.L. Bean, Inc.,* 303 F.3d 387, 394 (1st Cir.2002)).

"The focus of hostile work environment cases is generally on elements (4) and (5)", that is, the work environment must be severely abusive, subjectively and objectively. *Rigau,* 525 F.Supp.2d at 282. Title VII is violated whenever "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is **sufficiently severe or pervasive** to alter the conditions of the victim's employment." *Harris,* 510 U.S. at 20, 114 S.Ct. 367 (citations omitted)(emphasis added). Differently stated, "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title

VII." *Id.* In fact, the Supreme Court has clearly stated that "the prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the conditions of the victim's employment." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) Thus, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment— an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Id.*

Although there is no mathematically precise test to determine whether an environment is hostile or abusive, the Court must look at **all the circumstances,** which may include: (1) the frequency of the discriminatory conduct, (2) its severity, (3) whether it is physically threatening or humiliating, (4) whether it was just a mere utterance, and (5) whether it unreasonably interferes with an employee's work performance. *Harris,* 510 U.S. at 23, 114 S.Ct. 367; *see also, Pomales,* 447 F.3d at 83; *Marrero v. Goya of Puerto Rico,* 304 F.3d 7, 18–19 (1st Cir.2002); *Lee–Crespo v. Schering–Plough Del Caribe, Inc.,* 354 F.3d 34, 46 (1st Cir.2003).

Because this inquiry is fact specific, the determination is often reserved for a fact finder. *Marrero,* 304 F.3d at 19. Summary judgment, however, ". . . is an appropriate vehicle for poli[cing] the baseline for hostile environment claims." *Pomales,* 447 F.3d at 83 (internal citations omitted).

### 1. *Defendant's Motion for Summary Judgment*

Defendants maintain that Plaintiff's claim must be dismissed because she has failed to substantiate her allegations of a hostile work environment based on her gender. Specifically, they assert that the record in this case demonstrates that Mr. Arroyo was a very strict supervisor who was sometimes prone to rash behavior that made for a stressful work environment but that his behavior towards the plaintiff had nothing to do with her gender. They further add that Ms. Rosario lacks evidence to prove that the alleged actions were so pervasive as to alter the conditions of her employment.

Plaintiff's sexual harassment claim is predicated on a series of incidents and/or comments. For instance, plaintiff claims that Mr. Arroyo downloaded sexually oriented jokes from the computer and commented on them loudly, mostly when she was present; told "everyone" around the office that Plaintiff was dressing like a whore, a street woman, a prostitute; said that Plaintiff looked disgusting, that she was fat and has delinquent kids; and always felt uncomfortable with the way plaintiff dressed and was constantly addressing the "dress code". In various instances, "he would bring other people to [within] 5 feet [of] plaintiff" and would say ". . . look at her, how is she dressed, how those pants are so high. Look at those panties. And you can even see the . . ." (Docket No. 42) Viewed objectively, Mr. Arroyo's actions do not qualify as the type of severe conduct required by Title VII. In fact, what it is clear from the record is that Mr. Arroyo was a rude man that lacked courtesy and professionalism. That alone, however, cannot be the basis of a hostile work environment claim under Title VII. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)(simple teasing, offhand comments, and isolated incidents do not amount to a hostile work environment) and *Lee–Crespo,* 354 F.3d at 38–39 (a supervisor's prying questions about plaintiff's personal life, comments about her appearance, and questions of whether she ever dated doctors, not enough to constitute sexual harassment.)

■ Plaintiff further makes reference to an incident where Mr. Arroyo threw away her food, removed her pictures, purse, bills and other personal things from the front desk. This incident, although discourteous, cannot be framed as sexual harassment either and did not refer in any way to her gender. Far from being a sexual advance, this incident confirms Mr. Arroyo's unprofessional conduct towards his subordinates.[4] Thus, even if Ms. Rosario subjectively felt harassed, it is clear that she failed to show the objectively offensive standard of Title VII.

Mr. Maldonado's testimony in this regards is illustrative. When asked about the conversation he had with Ms. Rosario and Mr. Arroyo, he testified:

"... I gave each of them the opportunity to vent out and say what are their differences, what is it they feel uncomfortable with.

So, he—well, first, I give her the chance, being a female. And she expressed herself about being difficult to work with him and the way things were going. Then, I gave her the chance for rebuttal what had to say.

Well everytime she had something to say about the problem, he would say something else. So, I had to tell him to stop, and letting her say what she had to say. And then, I let him rebut what she had to say.

But there was no wishing issues to that. He continued to have that behaviorism. I just never left him. **And she is not the only female he used to do that to. He would just do it to other females that used to work there.** He'd just

intimidate them. Because, he used to be **edgy** all the time.

So, that mentality, I guess, never got away from him as being an NCO a noncommissioned officer. **But that's the way he treated all the females and also the males.** But, for some reason, the other females never said anything" ... (Docket No. 42, Exh. 1, pp. 327–328) (emphasis added)

■ Finally, it is important to mention that Title VII's standard attempts to ensure that it does not become a general civility code. When followed correctly, "it will filter out complaints attacking 'the ordinary tribulations of the workplace', such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275. (internal citations omitted)

Consequently, and after considering all the circumstances in this case, it is clear that plaintiff failed to present evidence to sustain a *prima facie* case of sexual harassment against defendants. She failed to prove that she was subjected to conduct sufficiently severe or abusive so as to constitute hostile work environment based on sex. Therefore, Defendant's Motion for Summary Judgment (Docket No. 34) is **GRANTED**. Plaintiff's claims are dismissed **WITH PREJUDICE**. Judgment shall enter accordingly. The Pretrial Conference scheduled for August 12, 2008 and the Jury Trial scheduled for August 25, 2008 are **VACATED**.

**IT IS SO ORDERED.**

---

4. In fact, Mrs. Cournier testified that Mr. Arroyo also threw away food that belonged to others. Specifically, she "saw him physically throwing away food that belonged to the other—you know, we—we had some pot—pot luck, or whatever and—and the people would leave the food there, you know covered. And he would throw it out because there was no place—without asking." And treated plaintiff "like a father trying to correct a little girl, right in front of the patients." (Docket No. 42, Exh. 1, pp. 315–316)